## HELMKE v. UNITED STATES.
### No. 20403.

District Court, E. D. Louisiana.

Oct. 23, 1934.

W. J. & H. W. Waguespack, of New Orleans, La., and Herbert W. Waguespack, of New Orleans, La., for libelant.

Edouard F. Henriques, Sp. Asst. in Admiralty to U. S. Atty., and W. I. Connelly, Atty. to U. S. Shipping Board, both of New Orleans, La., for respondent.

BORAH, District Judge.

Libelant, a member of the crew of the steamship Labette, brings this action against the United States for maintenance and also to recover damages for personal injuries received at about 4:10 o'clock on the morning of July 2, 1929, while the vessel was in the Gulf of Mexico off the west coast of Florida between Tortugas and Tampa.

Libelant, a seaman twenty-six years of age, was water-tender on the Labette during this voyage from Gulf ports to European ports and return. Upon coming off watch at 4 o'clock on the morning of the day in question, he claims that he proceeded to the amidships deck by way of the starboard ladder, crossed over to the port side of the vessel on the deck passageway which lies between the bulkhead and chain railing and was in the act of retracing his steps along this two and a half foot passageway when a dog ran between his legs and threw him off balance; that as he stumbled he grabbed the chain rail, which was to his right and along the outer edge of the deck, in an effort to steady himself and prevent his falling, but the chain gave way beneath his weight and pitched him to the after well deck eight feet below where he landed on his back and sustained the injuries complained of.

There are several specifications of negligence pleaded and those discussed in libelant's

brief are: Failure to have the passageway on the after end of the amidships deck sufficiently lighted; the negligent act of permitting a dog on board ship, and especially in permitting the dog to roam loose at night while the vessel was at sea where from the nature of things the footing was likely to be unsteady; and, finally, the gross negligence in permitting the chained rail to remain slack thereby affording insufficient protection to one grabbing it for support.

The action is thus one based solely on the charge of negligence, and the burden of proof is upon the libelant to establish with reasonable certainty that he was injured in substantially the manner claimed; that is, by a breach of duty owed by respondent to him in respect of the place where he was injured; and that in whole or in part his injuries resulted proximately therefrom.

The testimony establishes the fact that the dog on board ship was friendly and playful and that his presence was known to the master and that practically all of the crew regarded him as the ship's pet. No one, however, has admitted ownership of the dog nor is his species established, nor does it appear that any regulations, restrictions, or orders were issued by the owner or master with reference thereto.

Glaudot, an oiler, was apparently the only eyewitness who saw Helmke trip and fall and he says that Helmke called the dog from the messroom and " * * * was walking and playing with the dog, that is, petting the dog and holding a flashlight in one hand. As he got up to walk away is when he tripped over the dog, falling between the chains head first on the well deck right in front of No. 4 hatch." Glaudot thereupon went down the ladder to the well deck and assisted the deck boy in putting Helmke on his feet, whereupon the latter asked for his flash-light, denied further assistance, and said he could get along by himself.

The chief officer's log book under date of July 2, 1929, contains the following entry: "4:10 A. M. W. P. Helmke fell over chain rail on after end of Saloon Deck and bruised his right side on No. 4 hatch bracket. Man refused help and carried on."

The testimony is all one way that the anchor stanchion on the starboard side was bent on a previous voyage while loading or discharging cargo thus causing the chains to sag, and that no effort was made to correct this condition by straightening the stanchion or by taking in the slack on the turnbuckles.

While all witnesses agree that the chains which ran free through the eyes of the four supporting stanchions were not taut and that the bent stanchion caused the chains to sag, their estimates to the amount thereof varies from three to eight inches; however, the photographs in evidence which were taken the morning after the accident show an appreciable sag in both chains and that they were not taut enough to afford the protection required or intended.

The respondent was obligated to provide reasonably safe equipment for the libelant and I think it was a breach of that duty to him to fail to keep this chain railing reasonably safe for him and his fellow employees. When either through fault of the dog or otherwise the libelant lost his balance and involuntarily stumbled in the direction of and against the chain railing, he would have been uninjured except for the negligence in failing to keep the chain railing safe. There was no reason to suspect danger in allowing the dog on board ship or even in playing with him, and it was the natural and probable consequence of the negligent and wrongful failure to maintain a safe chain railing, that ought to have been foreseen in the light of the attending circumstances, that was the proximate cause of the injury.

Addison on Torts (8th Ed.), p. 51, declares the rule of law to be that the immediate cause, the causa proxima, of the damage and not the remote cause is to be looked at. "If the wrong and the legal damage," the writer says, "are not known by common experience to be usually in sequence, and the damage does not, according to the ordinary course of events, follow the wrong, the wrong and the damage are not sufficiently conjoined, as cause and effect, to support an action, unless it is shown that the wrongdoer knew, or had reasonable means of knowing, that the consequences not usually resulting from his act were, by reason of some existing cause, likely to intervene so as to cause damage to another."

In ascertaining the cause of injury in order to fix liability therefor, one cannot go behind the last cause. The final cause and its immediate effect alone concern the court. Liability for result and responsibility for final cause are regarded as inseparable. If one is responsible for the proximate cause, one must be responsible for the result. In my opinion the libelant has clearly established that the respondent was negligent in allowing the chain railing to remain in such condition that it did not afford the protection required

and its negligence was the proximate cause of the injury.

The other wrongful acts which it is alleged the respondent committed are not supported by the evidence and need not be considered.

The question of releases is one of the issues in this case, but I do not understand from the arguments submitted in brief that the issues thus raised present a serious controversy, therefore I shall forego any discussion of the subject and pass it with the general observation that it has received consideration, but like the other defenses is without merit.

Having determined the question of liability, there remains for consideration the quantum of damages that should be allowed. Libelant was injured on the morning of July 2d, and though the first and second assistant engineers both told him to take as much time off as needed, he laid off work but one day, that is, on July 4th, and worked to the end of the voyage on July 5th when he was paid off in Mobile, Ala. Upon being paid off, libelant went to the hospital at Mobile and from there to the Marine Hospital at New Orleans where he remained for three days. Feeling dissatisfied because his case was not receiving proper attention, he left this institution and sought the advice of a private physician. X-ray pictures were taken and upon examination it was found that libelant had a fracture of the right transverse process of the third lumbar vertebra; whereupon the doctor prescribed a belt to demobilize his back and ordered libelant to refrain from work for a period of from six to eight months. After remaining under the doctor's care for a period of nine months in the belief that he had a fractured spine, and during which period apparently nothing was done for him other than as stated, libelant then went to Memphis, Tenn., and on May 1, 1930, was again examined by a doctor of his own selection. This doctor found a slight limitation of motion in all directions of the lumbar spine and a slight tremor of the lumbar muscles on extreme flexion of the spine. On examination the right transverse process of the first lumbar vertebra was found to be completely absent; otherwise the X-ray appearance of the spine was found to be normal. The doctor also found on the basis of certain assumed facts and misinformation which was imparted to him by Helmke that the absence of this

process indicated that it had broken loose and become absorbed.

The medical testimony offered on behalf of the respondent consists of the testimony of three doctors; one a specialist on the subject of X-rays, another an orthopedic surgeon, and the third a roentgenologist. These doctors agree that the X-ray photographs which were made on July 8, 1929, July 22, 1929, and October 28, 1929, reveal a fracture of the right transverse process of the third lumbar vertebra but nothing to indicate an injury to the right transverse process of the first lumbar vertebra, and that had there been a fracture or separation of any part of the bony structure of this process it would have been discovered and shown in the X-ray photographs. They explain their failure to find evidence of a right transverse process by stating that such a condition is not considered unusual, particularly when the absence of the transverse process is found on either the first or fifth lumbar vertebra and that this condition is congenital. Such explanation, I am convinced, explains the absence of this process.

These doctors are also of the fixed opinion that there was no injury whatever to the vertebra proper as distinguished from an injury to the transverse process, and that had conditions been otherwise the resulting effect would have been injury to the nerves and, in all probability, attendant paralysis. They are likewise in accord that an injury to the transverse process is of relative insignificance.

Considering the testimony as a whole in the light of all the surrounding facts and circumstances of the case, I am persuaded that an award of $1,000 will fully compensate libelant for the injury sustained.

It is conceded that libelant is entitled to a recovery for maintenance and cure, the only dispute is as to the amount. Libelant's wages were $72.50 a month. Under the facts of this case, it is in my opinion proper to allow maintenance at the same rate for a period of six months. Recovery, on account of maintenance and cure should be for $435 less $170, heretofore paid under the alleged releases, or $265.

A decree may accordingly be entered for $265 maintenance and $1,000 damages, with interest thereon from the date thereof at the rate of 5 per cent. per annum until paid.