Barbara Jean JOHNSON,
Plaintiff-Appellee,
Cross-Appellant,

v.

OFFSHORE EXPRESS, INC.,
Defendant-Appellant,
Cross-Appellee.

No. 86–3302.

United States Court of Appeals,
Fifth Circuit.

June 3, 1988.

Rehearing Denied July 6, 1988.

James O.M. Womack, Henry S. Provosty, Burke & Mayer, New Orleans, La., for Offshore Exp., Inc.

Charles A. Verderame, New Orleans, La., for Johnson.

Edward J. Rice, Jr., New Orleans, La., for Dr. Alain F. Cracco.

William S. Penick, New Orleans, La., for Dr. R.C. Llewellyn, et al.

Before RUBIN, KING and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Offshore Express appeals a judgment by the district court in favor of Barbara Johnson, a seaman injured while employed by Offshore. The district court found Offshore negligent under the Jones Act and the M/V CHAMPION EXPRESS, upon which Johnson was working, unseaworthy. The court awarded Johnson damages for lost earnings, pain and suffering, and disfigurement and total permanent physical disability. Johnson, on cross-appeal, asserts that the damages awarded were inadequate. Offshore also appeals the district court's denial of its motion for a new trial based on newly discovered evidence and fraud. We affirm.

### I. *Factual Background and Prior Proceedings*

In November 1982, appellee/cross-appellant Barbara Johnson sought employment with appellant/cross-appellee Offshore Express, Inc. as an able bodied seaman and cook. Johnson, although only approximately five feet in height, had previously accumulated over 150 days of sea time with various offshore vessel companies and had obtained an able bodied seaman's license from the United States Coast Guard. Offshore hired Johnson, and on or about April 22, 1983, assigned her to a 165 foot supply boat, the M/V CHAMPION EXPRESS, to carry out sanitation and maintenance duties inside the enclosed cabin area of the vessel. Because of Johnson's height and inexperience, it was agreed that she would perform no duties outside the enclosed cabin area.

On April 22, 1983, while the M/V CHAMPION EXPRESS was still in dock, the mate, James Clay, ordered Johnson to make up the bunks in the passenger quarters of the vessel. Johnson did not comply with the order. On April 27, 1983, while the vessel was moored to an offshore drilling platform, Clay once again ordered Johnson to make up the bunks. At the time, the M/V CHAMPION EXPRESS was moored "side to" the platform and the seas were at four to six feet. Winds were ten to fifteen knots. This time Johnson complied with the mate's order and began to make up the bunks. Johnson asserts that while she was making up an upper bunk, a shift by the vessel caused her to fall from the bunk some six feet to the deck and land on her lower back. She asserts she had been making up the bunk from a kneeling position on the mattress with her legs dangling over the edge. She claims that she had been making up the bunk in this manner because she was unable to reach the width of the upper bunk by standing on the deck, or on the folding step used to facilitate entry into the bunk, or on the sideboard of the lower bunk. The accident was unwitnessed, although the cook for the vessel, in the nearby galley, heard a disturbance. Upon entering the passenger quarters, the cook saw Johnson on the floor in obvious pain.

The following day the vessel docked on shore, and Johnson was taken by ambulance to the Abbeville General Hospital in Abbeville, Louisiana. She was discharged the following day. Hospital records reported a large bruise on Johnson's lower back. Johnson returned to her residence in Galveston, Texas, and was examined by Dr. John Moore just over ten days later. She complained of severe headaches, back pain, and urinary problems. A bruise was still visible on Johnson's lower back. Johnson moved to New Orleans and began medical treatment with Drs. Alain F. Cracco, an orthopedic surgeon, and R.C. Llewellyn, a neurosurgeon. During an examination by Dr. Cracco on June 3, Johnson complained of pain, urinary problems, inability to sit up, and numbness and weakness in her left leg. Johnson exhibited a list of the lumbar spine to the left. Dr. Cracco referred her to Dr. Satish Karnik, a urologist, for a urological evaluation of her urinary problems.[1] Drs. Cracco and Llewellyn then performed back surgery on Johnson primarily to relieve compression of nerve roots, believed to have been brought on by trauma from the fall.

Johnson remained in the hospital recovering from this surgery until September 1983, when, after achieving significant recovery, she was transferred to another hospital to undergo intensive physical and occupational therapy. Johnson's condition, however, began to deteriorate—she began to exhibit a 10 degree hip flexion, internal rotation of her left hip, leg, and foot, and curvature of the spine. She also complained of experiencing great pain and being unable to walk.

---

1. Dr. Karnik diagnosed Johnson as suffering from severe urinary stress incontinence and a neurogenic bladder. Urinary stress incontinence is a mechanical problem of the bladder that can be caused by numerous conditions, including having children or a hysterectomy. A neurogenic bladder involves a neurological dysfunction of the bladder. Dr. Karnik had no definite opinion as to what caused either problem, but he recommended surgery to relieve the urinary stress incontinence.

On December 5, 1983, Dr. Richard Levy, a neurosurgeon, examined Johnson. During this examination, Johnson walked with a severe tilt to the left with her left hip, leg, and foot inwardly rotated. She claimed this posture helped to relieve the pain she was experiencing. She exhibited severe paraspinal muscle spasms and numbness in the lower part of both legs and said she was still experiencing urinary problems. Dr. Levy diagnosed Johnson as suffering from arachnoiditis,[2] probably arising from complications from the previous back operation. One week later, Dr. Cracco re-examined Johnson and decided to perform exploratory surgery and remove an arachnoid cyst which apparently had developed from complications from Johnson's initial back surgery. After recovering from this second operation, Johnson resumed her therapy. She remained in the hospital until the end of May, except for a short period during April at another hospital where she had a gall bladder operation.

Johnson was discharged from the hospital in June 1984, and transferred to the Touro Pain Center. Here, she was examined by Dr. Gary Glynn, who could find no major neurological dysfunction. Johnson continued to exhibit a tilted hip and an inwardly rotated left hip, leg, and foot which she claimed helped to relieve the pain she was experiencing. Dr. Richard Morse, a psychiatrist and neurologist at Touro, reviewed reports from various examining physicians and concluded that Johnson may have been exhibiting complications and symptoms that were not really present and may have been experiencing various psychiatric disorders. He felt that some of Johnson's pain may have been brought on by emotional factors. Dr. Morse characterized Johnson as not being very open to counseling and not exhibiting any motivation to improve her condition. Dr. Morse, however, did not disbelieve that Johnson was experiencing great pain.

Due to Dr. Morse's conclusion that Johnson was not responding to treatment at the Touro Pain Center, Johnson was dis-

charged to home care after about a month. She then rented an apartment in New Orleans. Her teenaged son Michael helped care for her. She made periodic visits to doctors and physical therapists during this time. She remained on pain medication but was able to walk with crutches by the end of the year. Dr. Neil Baum, a urologist, examined Johnson on August 31, 1985, and confirmed Dr. Karnik's diagnosis of urinary stress incontinence, but he did not conclude that Johnson was also suffering from a neurogenic bladder. During a second visit to Dr. Levy on November 26, 1985, now two and a half years after her injury, Johnson continued to complain about severe pain in her lower back, left hip and leg, numbness in the left leg, and urinary problems. She held her left leg and foot inwardly rotated.

In the meantime, Johnson had filed suit against Offshore on October 25, 1983, in the United States District Court for the Eastern District of Louisiana. As a seaman employed by Offshore at the time of her injury, she advanced claims of negligence under the Jones Act, 46 U.S.C. § 688, and unseaworthiness under general maritime law. On October 16, 1984, Offshore filed a third-party medical malpractice action against two of Johnson's treating physicians, Drs. Cracco and Llewellyn, for indemnity for the maintenance and cure payments Offshore made to Johnson and for damages incurred by Offshore as a result of alleged negligence and unwarranted medical treatment by the two doctors.

Both actions were tried without a jury beginning January 6, 1986. After an eleven day trial, the district court rendered judgment in favor of Johnson on her claims of Jones Act negligence and unseaworthiness against Offshore and the M/V CHAMPION EXPRESS. The court found Offshore 80% at fault for Johnson's injuries and Johnson 20% at fault. The court ruled in favor of Drs. Cracco and Llewellyn on Offshore's third-party action against

---

**2.** Arachnoiditis is the inflammation of the filmy covering of the nerve roots of the lumbar region which leads to the formation of scar tissue. This scarring in turn results in the malfunction of the affected nerves and severe pain. This is a permanent condition and cannot be cured.

them, holding that malpractice was not proved. The court awarded Johnson damages of $37,180 for past lost wages; $123,708 for future lost wages; $370,000 for past and future mental pain and suffering; and $185,000 for past, present, and future disfigurement and physical disability.[3]

Johnson filed a number of post-trial motions, urging the court to reconsider several of its findings. She urged that the court had erred in its failure to award her any damages for her urinary problems. In addition, she claimed the court's calculation of damages attributable to lost wages was too low because it was based on the incorrect assumption that she only worked nine months a year. Johnson also pointed out that Offshore was entitled to a $10,056 credit in the judgment against it for maintenance and support paid by Offshore prior to the trial. The district court issued an amended judgment on April 8, 1986, to incorporate the $10,056 credit for Offshore, but did not grant Johnson any further relief. Offshore then appealed the court's finding of negligence against it, the finding of unseaworthiness against the M/V CHAMPION EXPRESS, and the award of damages. Johnson cross-appealed the judgment on the issues of damages for her urinary problems and the calculation for lost wages.

The scene shifts. On July 28, 1986, approximately six months after the trial, fourteen individuals were arrested by U.S. Customs Service agents in connection with an investigation into a conspiracy to overthrow the government of the Republic of Suriname. This group of arrestees included Barbara Johnson and her son Michael. Johnson was subsequently indicted for conspiracy under 18 U.S.C. § 371 and for violations of the Neutrality Act, 18 U.S.C. §§ 960, 962. On November 5, 1986, she was sentenced to one year in federal prison.

On February 23, 1987, Offshore filed a motion for a new trial under Fed.R.Civ.P. 60(b). Offshore asserted two grounds for a new trial: the "newly discovered evidence" of Johnson's post-trial activities (Fed.R.Civ.P. 60(b)(2)), and alleged fraud, misrepresentation, and misconduct by Johnson during the previous trial (Fed.R.Civ.P. 60(b)(3)). Offshore supported its motion with the affidavits of two U.S. Customs agents who had worked undercover in connection with investigating the conspiracy. These agents allegedly had seen Johnson exhibit a much improved physical condition and had heard her downplay the seriousness of her disabilities. These same agents also stated that Johnson's physical condition appeared greatly deteriorated after she was arrested and was told that there might be cameras covering the arrest.

The motion for new trial was argued before the district court on April 8, 1987. The court denied the motion. Offshore appeals this ruling and this appeal has been consolidated for our review with the direct appeal of the rulings of the district court regarding the negligence of Offshore, the unseaworthiness of the M/V CHAMPION EXPRESS, and the damages awarded Johnson.

## II. *The Finding of Jones Act Negligence*

Questions of negligence and causation in admiralty cases are treated as fact questions. *Landry v. Oceanic Contractors, Inc.,* 731 F.2d 299, 302 (5th Cir. 1984); *Cheek v. Williams-McWilliams Co., Inc.,* 697 F.2d 649, 652 (5th Cir.1983). Findings of fact in admiralty cases are binding unless clearly erroneous. *Landry v. Oceanic Contractors,* 731 F.2d at 302. Evidence of the "slightest" negligence is sufficient to sustain a finding of Jones Act liability. *Theriot v. J. Ray McDermott & Co., Inc.,* 742 F.2d 877, 881 (5th Cir.1984); *Allen v. Seacoast Products, Inc.,* 623 F.2d 355, 361 (5th Cir.1980). We have described the burden on a plaintiff for showing causation in a Jones Act claim as "featherweight." *Smith v. Trans-World Drilling Co.,* 772 F.2d 157, 162 (5th Cir.1985); *Davis*

---

**3.** These damages were gross and subject to a 20% reduction attributable to Johnson's contributory negligence.

*v. Hill Engineering, Inc.*, 549 F.2d 314, 331 (5th Cir.1977).

The district court found that Offshore was negligent in ordering Barbara Johnson, a five foot tall person, to make up upper bunks in four to six foot seas without providing her with assistance and knowing of her inexperience. The court found that a lurch by the the vessel caused Johnson to fall backwards onto the deck while she was making up an upper bunk. We accept this finding of negligence under the clearly erroneous standard. There is sufficient evidence in the record to support the finding.

The record establishes that although Johnson had an able bodied seaman's license, she had spent relatively little time at sea. The majority of the time she had spent at sea evidently was as a cook. The record does not show that Johnson had experience in making up upper bunks in a vessel. Offshore was aware of Johnson's relative inexperience and obviously of her short stature.

The bunk from which Johnson fell was 4'5" above the deck. There was no dispute that the bunk in question was of a proper design and standard configuration for its intended use—sleeping. The bunk was equipped with a small folding step 15 inches above the deck and with a hand railing situated on the ceiling over the middle of the bunk. This equipment, however, was designed to help people get into the upper bunk for sleeping and at best only indirectly to facilitate making up the bunk. Each bunk also had a sideboard 3½" higher than the top of the mattress, except for a space approximately 2½' located at the middle of the bunk to allow entry into the bunk. This sideboard was designed to protect a person from falling out of the bunk while sleeping.

Johnson's safety expert, Alvin Marks, testified that because of Johnson's stature, it was physically impossible for her to reach across the width of the upper berth mattress to make up the bunk from a standing position on the folding step or from a standing position on the lower bunk sideboard. There were diagrams and photographs supporting this testimony. Offshore's witnesses did not seriously contend that Johnson could have or even should have made up the upper bunk by standing on the folding step or the sideboard of the lower bunk. They instead asserted that safer alternative methods of making up the upper bunk were available.[4] There was no evidence, however, that Johnson was told about these alternative methods or even knew about them. The mate who gave Johnson the order testified that he had not even thought about how Johnson would make up the bunks or considered her size before assigning the task. There was also testimony from much taller witnesses that making up an upper bunk was a difficult task, especially in rolling seas. Finally, there was expert testimony to the effect that the mate should have given Johnson an assistant to help her make up the upper bunks.

The testimony as to whether Johnson was offered assistance in making up the bunks was somewhat contradictory. It was uncontradicted, however, that the mate ordered Johnson to make up the bunks without providing her with assistance. The engineer for the vessel, Dennis Olson, testified that while she was making up the bunks but prior to her fall, Johnson told him she was having a dizzy spell. Olson testified that he offered to assist Johnson in making up the remaining bunks or to get another crewman to assist but that Johnson refused this assistance. In her testimony before the court, Johnson denied that she had been experiencing dizzy spells prior to her fall and that she had this conversation with Olson. She also denied being offered any assistance in making up the bunks. The district court had the responsibility to sift through this contradictory testimony, assessing the witnesses' credibility, in making its findings of fact as to the events in question.

**4.** One of Offshore's witnesses testified that it would have been safer for Johnson to climb totally into the upper bunk, face the length of the mattress rather than the width, and use her foot and knee as a brace against the sideboard of the bunk.

Finally, Offshore alleges that the evidence did not support the finding that there had been a lurch by the M/V CHAMPION EXPRESS on April 27, 1983, causing Johnson to topple from the upper bunk. The record is to the contrary. There is no dispute that the seas were four to six feet the day of the accident. There was testimony that in such seas, and given the mooring and rigging of the vessel, the M/V CHAMPION EXPRESS could have shifted in such a way to cause Johnson to fall from her perch on the upper bunk. Such a shift might not have been noticeable to others on the vessel at the time because they were not in a position where their balance was thrown off as was Johnson. The fact that Johnson was the only one on board who noticed the lurch is not necessarily unusual and does not negate the district court's finding that there had been a lurch. *See Curry v. Fluor Drilling Services, Inc.,* 715 F.2d 893, 895 (5th Cir.1983).

### III. *The Finding of Unseaworthiness*

To be seaworthy, a vessel and its appurtenances must be reasonably suited for the purpose or use for which they were intended. *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550, 80 S.Ct. 926, 933 (1960). The owner's duty to furnish a seaworthy ship is absolute and completely independent of the duty under the Jones Act to exercise reasonable care. 362 U.S. at 549, 80 S.Ct. at 932. *See also Springborn v. American Commercial Barge Lines, Inc.,* 767 F.2d 89, 100 (5th Cir.1985). Liability under the doctrine of unseaworthiness does not rest upon fault or negligence. *Hussein v. Isthmian Lines, Inc.,* 405 F.2d 946, 947 (5th Cir.1968).

There is a more demanding standard of causation in an unseaworthiness claim than in a Jones Act negligence claim. *Smith v. Trans-World,* 772 F.2d at 162; *Landry v. Oceanic Contractors,* 731 F.2d at 302. To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness. *Smith v. Trans-World,* 772 F.2d at 162; *Alverez v. J. Ray McDermott & Co., Inc.,* 674 F.2d 1037, 1042–43 (5th Cir.1982). Some condition or defect may be a legally sufficient cause of an injury under a Jones Act theory of liability but not under an unseaworthiness theory. *Smith v. Trans-World,* 772 F.2d at 162; *Landry v. Oceanic Contractors,* 731 F.2d at 302. We stress again that Jones Act negligence and unseaworthiness under general maritime law are two distinct causes of action, each involving separate standards of proof, causation, and review. *Comeaux v. T.L. James & Co., Inc.,* 702 F.2d 1023, 1024 (5th Cir.1983).

Despite the higher standard for establishing causation on an unseaworthiness claim, we hold that the district court was not clearly erroneous in finding that the M/V CHAMPION EXPRESS was unseaworthy and this unseaworthiness was a proximate cause of Johnson's injury. Specifically, the court found that the vessel was unseaworthy because, first, it lacked proper equipment for a person only five feet tall to make up an upper bunk in four to six foot seas, and, second, the vessel lacked adequate manpower.

The testimony established that no adequate equipment was provided to Johnson to make up the upper bunks. The small fold-down step and the overhead handrail clearly were not designed for making up the upper bunk, and the mate testified that he would not use this equipment to make up upper bunks because it was unsafe. In any event, testimony and exhibits sufficiently established that these devices were inadequate to enable Johnson to make up the upper bunk because of her height. The court concluded that had Johnson been provided with a ladder, and an assistant to hold the ladder, she could have performed her bunk making duties with reasonable safety. As it was, the court found that the only way Johnson could have performed her duties was to crawl up into the upper bunk, kneel on the edge of the mattress and thus expose herself to any shift by the vessel. Under general maritime law, un-

seaworthiness can be manifested by an unsafe method of work, such as the failure by a shipowner to provide adequate equipment for the performance of an assigned task. *Vargas v. McNamara*, 608 F.2d 15, 18 (1st Cir.1979); *Webb v. Dresser Industries*, 536 F.2d 603, 606 (5th Cir.1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 1157 (1977).

There was testimony by the various experts, including Johnson's, that ladders and platforms for use for making up upper bunks are not standard shipboard equipment or appliances, and that the design and configuration of the bunks in the passenger cabin of the M/V CHAMPION EXPRESS were in accordance with usual maritime practice. This testimony did not establish the seaworthiness of the M/V CHAMPION EXPRESS. Customary or normal industry practice alone does not establish seaworthiness. *June T., Inc. v. King*, 290 F.2d 404, 406 (5th Cir.1961); *Davis v. Associated Pipe Line Contractors, Inc.*, 305 F.Supp. 1345, 1349 (W.D.La. 1968), *aff'd* 418 F.2d 920 (5th Cir.1969), *cert. denied*, 397 U.S. 988, 90 S.Ct. 1119, 25 L.Ed.2d 396 (1970). In the case of someone the height of Johnson, some type of ladder or platform was necessary in order for the person to make up the upper bunks in safety given the seas running and the mooring. No such equipment was provided Johnson when she was ordered to perform this task.

The fact that there may have been a safer alternative method for Johnson to make up the upper bunk, by climbing all the way into the bunk and facing lengthwise to the mattress, does not break the causal chain in this unseaworthiness claim. While testimony did establish that this alternative method was probably safer, there was no testimony establishing that Johnson was aware of this method, or should have been aware, or that this method was really feasible. *See Ceja v. Mike Hooks, Inc.*, 690 F.2d 1191, 1194 (5th Cir.1982). For these reasons, we hold that the district court's finding of unseaworthiness was not clearly erroneous.

### IV. *Finding that Johnson Was 20% Contributorily Negligent*

A trial court's allocation of percentages of fault is a finding of fact and is not to be disturbed unless clearly erroneous. *Allied Chemical Corporation v. Hess Tankship Company of Delaware*, 661 F.2d 1044, 1057 (5th Cir.1981). The court in the case at bar found that Barbara Johnson was 20% at fault for her accident and that her negligence was a legal cause of her injuries. The court found Johnson at fault for not insisting that the mate provide her with assistance and proceeding with making up the upper bunk in a risky manner, knowing from her experience as a seaman that the vessel, in four to six foot seas, could lurch and cause her to be thrown from the bunk.

Under the Jones Act and the law of seaworthiness, contributory negligence, however gross, does not bar recovery, but only mitigates damages. *Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424, 431, 59 S.Ct. 262, 266, 83 L.Ed. 265 (1939); *Scott v. Fluor Ocean Services, Inc.*, 501 F.2d 983, 984 (5th Cir.1974). Although the seaman has a duty to use reasonable care, the seaman's duty to protect himself is slight since this duty is tempered by the realities of maritime employment. *Ceja v. Mike Hooks*, 690 F.2d at 1193. Generally, a seaman has no duty to find the safest way to perform his work. Rather, the duty to provide for a safe course of conduct lies primarily with the vessel owner. 690 F.2d at 1194.

We find the allocation of fault by the district court adequately supported by the record and thus not clearly erroneous. Offshore contends that Johnson's alleged refusal of assistance from Olson constituted a superseding act of negligence sufficient to establish Johnson's negligence as the sole proximate cause of her injury. This extreme claim must fail. The 80%/20% allocation of fault is supported by the record. Furthermore, Johnson denied that Olson had offered to assist her in making up the upper bunks, and the district court had the discretion to evaluate the credibility of the various witnesses.

### V. *Damages*

A trial judge's assessment of damages is also a finding of fact which we review under the clearly erroneous standard. *Hernandez v. M/V RAJAAN*, 841 F.2d 582, 587 (5th Cir.1988); *Sosa v. M/V LAGO IZABAL*, 736 F.2d 1028, 1035 (5th Cir.1984). This Court will not overturn a damage award unless the trier of fact abused its discretion. *Hernandez*, 841 F.2d at 587; *Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 331 (5th Cir. 1987). We overturn damage awards only in exceptional cases where such awards are so gross as to be contrary to "right reason." *Bartholomew*, 832 F.2d at 326. Furthermore, we do not determine excessiveness of damage awards by comparing verdicts in similar cases, but rather we review each case on its own facts. *Hernandez*, 841 F.2d at 587; *Winbourne v. Eastern Airlines, Inc.*, 758 F.2d 1016, 1018 (5th Cir.1984), *cert. denied*, 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 582 (1985).

### A. The Finding of Total Permanent Disability and the Award for Lost Earnings

The district court found that because of her back and leg physical impairments Barbara Johnson was totally disabled from all forms of gainful employment due to her inability to sit or stand for any significant length of time. The court found that Johnson would be totally disabled for the remainder of her life.[5] The court found that Johnson's back and leg problems stemmed largely from arachnoiditis, which was a complication resulting from her initial back operation. Dr. Levy, one of Offshore's medical experts, testified at trial that the arachnoiditis, and the accompanying severe pain, was a permanent condition, rendering Johnson permanently disabled from pursuing any kind of activity that would require prolonged standing or sitting.

The court found that Johnson could not walk more than a few steps without the aid of her crutches. The testimony of Teresa Ross, a physical therapist who had worked with Johnson, supported this finding. The court also found that Johnson suffered from congenital spina bifida which Dr. Cracco testified had been aggravated by the trauma from Johnson's fall, causing it to become symptomatic. The court also found that Johnson suffered from a vertical displacement between her left and right hip. The testimony of Dr. Gary Glynn and Teresa Ross supported this finding. The court also found that Johnson walked with a noticeable limp. The court, however, concluded that Johnson had failed to prove that the abnormal inward rotation of her left hip, leg, and foot had resulted from the accident.[6] We find the district court's determination that Johnson was totally and permanently disabled and unable to obtain future employment adequately supported by the record and not clearly erroneous.

Offshore does not challenge the actual amount of damages for lost earnings, or the method used to calculate that amount. But in her cross-appeal, Johnson contends that the court erred in reducing her award for past and future lost earnings by 25% on the assumption that Johnson worked only nine months out of the year. Johnson, however, testified that in the past she had worked only nine months out of the year and had taken the summers off in order to vacation with her children. We do not find the court's assumption that Johnson worked only nine months out of the year, and the calculation of past and future

---

5. Bobby Roberts, Johnson's expert in the field of vocational rehabilitation, evaluated Johnson on October 14, 1985, and testified at trial that there was no job Johnson was presently capable of performing given her problems with sitting and standing. Roberts testified that even if Johnson acquired some kind of college degree, if her physical condition stayed the same, the most she could look forward to was part-time work with an agency that used handicapped workers.

6. The court found that this condition may have been a voluntary posture to relieve pain and was not constant. The testimony at trial did not establish any objective medical reason for this rotation. The court did not include this condition in its consideration of the extent of Johnson's disability.

lost earnings based on this assumption, clearly erroneous.

### B. Pain and Suffering/Disfigurement and Physical Disability

The district court awarded Johnson $370,000 for past and future pain and suffering and $185,000 for disfigurement and physical disability. Offshore asserts that these amounts are inordinate and grossly excessive when compared with awards in similar cases, and clearly erroneous because of insufficient corroborating medical testimony. We do not agree.

■ We address the award for disfigurement and physical disability first. The court awarded these damages because of Johnson's having to walk on crutches for the remainder of her life. This finding is adequately supported by the testimony establishing that Johnson suffers from arachnoiditis, spina bifida, and a displaced hip. We find that the award for disfigurement and physical disability, although generous, is sufficiently supported by the record and not excessive.

■ In regard to the damages for pain and suffering, we have recently stated: " '[A]ny amount awarded for pain and suffering depends to a great extent on the trial court's observation of the plaintiff and its subjective determination of the amount needed to achieve full compensation.' " *Hernandez*, 841 F.2d at 590 (*quoting Hyde v. Chevron U.S.A., Inc.*, 697 F.2d 614, 632 (5th Cir.1983)). We have also held that each award for pain and suffering depends heavily on its own facts. *Allen v. Seacoast Products*, 623 F.2d 355, 364 (5th Cir.1980). The district court's award for Johnson's severe, constant, and permanent pain is adequately supported by the medical testimony at trial. None of the doctors who testified asserted that Johnson had not experienced serious pain and that she would not suffer similar pain the remainder of her life. The diagnosis of arachnoiditis by Dr. Levy amply substantiates Barbara Johnson's subjective testimony regarding the pain she was suffering. We do not consider this award for pain and suffering clearly erroneous or excessive.

### C. The Urinary Problems

■ In her cross-appeal, Johnson asserts that the district court erred in not awarding her any damages for her urinary problems by finding that these problems were not caused or aggravated by her accident. We find no error.

Dr. Cracco and Dr. Baum both testified that Johnson's urinary stress incontinence was not related to her nerve root problem or related in any way to her fall. There was testimony that Johnson had suffered from this condition well before the accident and had even had a bladder suspension operation to correct the problem in 1977. Dr. Baum testified that the reappearance of Johnson's urinary stress incontinence was attributable to the failure of this previous operation and was in no way related to her fall. Dr. Karnik opined that Johnson's urinary stress incontinence may have been aggravated by her fall.

Dr. Karnik also diagnosed Barbara Johnson as suffering from a neurogenic bladder that was probably caused by her nerve root problems and arachnoiditis. Dr. Baum, however, did not believe Johnson was suffering from a neurogenic bladder because of his inconsistent findings as to the sensitivity of Johnson's bladder nerves. We cannot attribute error to the court's crediting Dr. Baum's testimony over Dr. Karnik's. *Charpentier v. Fluor Ocean Services, Inc.*, 613 F.2d 81, 85 (5th Cir.1980). We conclude that the district court's negative findings as to Johnson's urinary problems are not clearly erroneous.

### VI. *The Motion for New Trial*

■ We now turn our attention to the most serious and difficult aspect of this case, the motion for a new trial. It is well established law that a motion for new trial under Fed.R.Civ.P. 60(b) is addressed to the sound discretion of the trial court whose decision will not be reversed absent a clear abuse of discretion. *Ag Pro, Inc. v. Sakraida*, 512 F.2d 141, 144 (5th Cir.1975), *reversed on other grounds*, 425 U.S. 273, 96 S.Ct. 5532, 47 L.Ed.2d 784 (1976); *Bir-*

*chem v. Burlington Northern Railroad Company,* 812 F.2d 1047, 1050 (9th Cir. 1987); *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509, 515 (8th Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *Square Construction Company v. Washington Metropolitan Area Transit Authority,* 657 F.2d 68, 71 (4th Cir.1981).

■ Offshore asserted two grounds under Rule 60(b) upon which to grant a new trial. The first ground was "newly discovered evidence" under Rule 60(b)(2). This "newly discovered evidence" offered by Offshore were details of Johnson's involvement in the conspiracy to overthrow the Republic of Suriname some six months *after* the original trial. "Newly discovered evidence" under Rule 60(b)(2), however, must be evidence of facts existing at the time of the original trial. *N.L.R.B. v. Jacob E. Decker and Sons,* 569 F.2d 357, 364 (5th Cir.1978); *Mumford v. Bowen,* 814 F.2d 328, 330 (7th Cir.1986); *Corex Corp. v. United States,* 638 F.2d 119, 121 (9th Cir.1981); *Still v. Townsend,* 311 F.2d 23, 24 (6th Cir.1962); *Ryan v. United States Lines Co.,* 303 F.2d 430, 434 (2nd Cir.1962); *Brown v. Pennsylvania Railroad Co.,* 282 F.2d 522, 526-27 (3rd Cir.1960), *cert. denied,* 365 U.S. 818, 81 S.Ct. 690, 5 L.Ed.2d 696 (1961); 11 Wright & Miller ¶ 2859, at 182. The evidence presented by Offshore clearly does not meet this requirement.

The second ground which Offshore asserted for a new trial was fraud, misrepresentation, and misconduct under Rule 60(b)(3). Offshore claimed that Barbara Johnson had faked physical problems and lied about the extent of her injuries during her personal injury trial. Offshore claimed that Johnson's post-trial activities revealed that she was not nearly as disabled as she had previous presented herself at trial and that she faked serious crippling whenever she was near a courthouse or camera.

■ An allegation of fraud urged by a party as a basis for new trial under Rule 60(b)(3) must be established by clear and convincing evidence. The conduct complained of must have prevented the moving party from fully and fairly presenting his case or defense. *Montgomery v. Hall,* 592 F.2d 278, 278-79 (5th Cir.1979); *Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1339 (5th Cir.1978); *Square Construction Co.,* 657 F.2d at 71; *Wilkin v. Sunbeam Corp.,* 466 F.2d 714, 717 (10th Cir.1972), *cert. denied,* 409 U.S. 1126, 93 S.Ct. 940, 35 L.Ed.2d 258 (1973); *Atchison, Topeka and Santa Fe Railroad Co. v. Barrett,* 246 F.2d 846, 849 (9th Cir.1957). This subsection of Rule 60(b) is aimed at judgments which were unfairly obtained, not at those which are factually incorrect. *Rozier,* 573 F.2d at 1339. Granting a motion for new trial under Rule 60(b) on the basis of fraud or other misconduct is within the discretion of the district court that presided in the previous litigation, although because this rule is remedial in nature it should be liberally construed. *Id.* at 1346. In an extensive search we have been unable to discover any previous cases where a court has granted a motion for new trial under Rule 60(b) based on the fraud, misrepresentation, or misconduct of a plaintiff in testifying to his injuries in a personal injury lawsuit.[7] We decline at this point to rule out the possible use of a Rule 60(b) new trial motion in such circumstances, but merely hold that the district court did not abuse its discretion in declining to grant such a motion on the record in this case.

■ Offshore's allegations do not establish that the district court abused its discretion in denying Offshore's motion for new trial on the basis of fraud. During the hearing on the motion for new trial, the district court explained that it had not based the award of damages in the earlier trial on Johnson's testimony or presentation of her injuries, but instead on medical testimony. The record adequately sup-

---

**7.** In *Atchinson, Topeka, and Sante Fe Railroad Co. v. Barrett, supra,* the district denied a motion for new trial which asserted that a plaintiff had faked personal injuries in order to recover damages from his employer in a personal injury

suit. The Ninth Circuit upheld the denial on appeal although the court stated that had the district court granted the motion, it "would not have disturbed that conclusion, on the record before us." 246 F.2d at 849.

ports the district court's statement. The district court explained that it had not believed everything that Johnson had said during the trial. This is evidenced by the decision not to award Johnson any damages for her inwardly rotated hip, leg, and foot or for her urinary problems. During the trial the court had viewed a videotape recording showing Johnson walking without manifesting the rotated hip, leg, and foot condition and thus knew Johnson was capable of exaggerating her ailments.[8] The doctors who testified as to Johnson's disability and injuries were also aware that Johnson exaggerated her physical disabilities. The district judge stated that she had adequately discounted Johnson's testimony and her contrived appearances in the trial and the alleged new evidence of Johnson's ability to fake injury did not change anything.[9] We see no abuse of discretion.

■ We also do not believe the evidence of fraud presented to the district court by Offshore was clear and convincing. Depositions taken by Johnson's lawyer of the government agents greatly undermined the impact of their previous affidavits. In these depositions, the two agents were much less sure of the extent of Johnson's abilities and activities than they were in their affidavits.[10] The depositions also reveal that much of the alleged evidence of fraud consisted of what Johnson said she could do under the lure of a huge monetary reward if the freebooting conspiracy had succeeded. The affidavits did not show what she was actually capable of doing. Overall, this evidence of fraud calls for much conjecture and is by no means clear and convincing.

Johnson herself may not have been thoroughly candid with the court as to her condition. But the court accepted this and did not rely upon her testimony. Thus, the showing of fraud would have to be based either upon fraud in the medical testimony itself or fraud in her misleading the doctors as to her condition. But the court found that the medical diagnoses were based upon objective physical evidence. The doctors themselves also recognized that appellant's own subjective presentations were likely exaggerated and distorted. Obviously, there was no fraud in the medical evidence. And on this record we must uphold the conclusion of the district court that the medical evidence was objective and was not to any significant extent based upon Johnson's assertions of disability. We find no abuse of discretion in denying the motion for new trial on the basis of fraud.

■ Finally, if Johnson's physical condition actually has improved after trial, this is not grounds for a new trial. Judgments

---

**8.** The videotape was a selection of recordings taken during intermittent surveillance of Johnson by Offshore prior to the trial. During the trial, the court was also aware that Johnson was capable of driving a car, swimming, and walking some distance on her crutches. The court knew that Johnson had attended classes at a local community college for three semesters after her accident. The court was also aware that Johnson was showing some improvement in her ability to get around. These activities do not undermine the court's award of damages to Johnson since they do not involve prolonged sitting or standing. Nor do they show that Johnson no longer suffered from severe pain.

**9.** It bears repeating that the district court based its finding of disability largely on the pain Johnson suffered from arachnoiditis and her inability to stand or sit for long periods of time because of this pain. Johnson's alleged activities in the conspiracy are not necessarily contrary to this finding. There was solid objective medical evidence supporting the diagnosis of arachnoiditis.

**10.** In their depositions, the agents explained that the type of activities they saw Johnson engaged in prior to her arrest included conversations in the lobby and walkways of a motel while leaning on a railing or a lightweight cane, eating dinner at a restaurant near the motel, walking to and from the restaurant with her cane, and attending various meetings in rooms of the motel. Both agents, however, admitted to seeing Johnson walking with a limp. The depositions also reveal that Johnson's "transformation" into a much more crippled individual did not occur until after she had been arrested and hauled around in a van and car for several hours while handcuffed, with no opportunity to walk around, and with no access to her pain medication. Under these circumstances it is not implausible that Johnson would exhibit a much more serious physical condition upon her arrival in New Orleans at the United States Customs House.

**1360**

are final as to the condition that existed at trial, absent misconduct. A prediction by way of court finding as to a future disability which later proves to be incorrect because of unexpected improvement after trial cannot justify a new trial.

### VII. *Conclusion*

Upon a thorough review of the record, we affirm the district court's finding of Jones Act negligence against Offshore Express, the court's finding of unseaworthiness as to the M/V CHAMPION EXPRESS, and the award of damages to Barbara Johnson. None of these findings are clearly erroneous. We also conclude that the district court did not abuse its discretion in denying Offshore's motion for new trial.

AFFIRMED.