# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-30638
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**
March 2, 2018

Lyle W. Cayce
Clerk

DENETRA THOMAS,

Plaintiff - Appellant

v.

HERCULES OFFSHORE SERVICES, L.L.C.; HERCULES OFFSHORE, INCORPORATED,

Defendants - Appellees

Appeal from the United States District Court
for the Middle District of Louisiana
USDC NO. 3:15-CV-33

Before BENAVIDES, CLEMENT, and GRAVES, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Denetra Thomas ("Thomas") appeals the summary judgment entered against her in favor of Defendants-Appellees Hercules Offshore Services and Hercules Offshore, Incorporated ("Hercules") with respect to her Jones Act and maritime claims for negligence and

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-30638

unseaworthiness arising out of an injury that occurred on a mobile offshore drilling rig. Finding no reversible error, we AFFIRM.

## I.    PROCEDURAL HISTORY AND BACKGROUND

On May 26, 2013, Thomas was employed by Hercules as a galley hand aboard the HERCULES 264, a mobile offshore drilling unit. That evening, Thomas was returning to her stateroom from the bathroom when her left foot struck the raised doorsill between the stateroom and the connected bathroom. The raised doorsill measured two inches high and approximately three and a half inches wide. Thomas awoke the next morning in pain from the fall. She informed the manager and the medic of her accident and was taken ashore for medical treatment. Thomas was initially diagnosed with lumbar strain and a right hip contusion. Hercules began paying Thomas maintenance and cure from the date her injury was reported.

On January 26, 2015, Thomas filed a complaint in federal district court in the Middle District of Louisiana, alleging negligence under the Jones Act, unseaworthiness under general maritime law, and a claim for maintenance and cure benefits. The next day, Thomas amended her complaint. Hercules filed its answer to the amended complaint. Subsequently, Hercules filed two motions for summary judgment. One motion sought summary judgment with respect to liability. The other motion sought summary judgment with respect to the maintenance and cure payments, arguing that Thomas was not entitled to those payments because she had failed to disclose previous injuries on her employment application. Thomas opposed both motions. Ultimately, the district court granted both of Hercules's motions for summary judgment. At that point, Hercules stopped making maintenance and cure payments. Hercules had paid Thomas a total of $44,490 in maintenance payments and

No. 17-30638

approximately $13,000 for medical treatment of her injuries.  Thomas now appeals.

II.   ANALYSIS

A. Standard of Review

This Court reviews a "grant of summary judgment de novo, applying the same standard as the district court." *QBE Ins. Corp. v. Brown & Mitchell, Inc.*, 591 F.3d 439, 442 (5th Cir. 2009).  The moving party is entitled to summary judgment if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

B. Preemption

Thomas argues the district court erred in holding that because the HERCULES 264 was an "inspected" vessel, the Occupational Safety and Health Administration ("OSHA") regulations had been preempted by the Coast Guard regulations.   Instead, she argues that the drilling rig was an "uninspected" vessel and thus, the OSHA regulations had not been preempted.

Congress has given the Coast Guard the authority to "administer laws and promulgate and enforce regulations for the promotion of safety of life and property on and under the high seas and waters subject to the jurisdiction of the United States, covering all matters not specifically delegated by law to some other executive department."  14 U.S.C. § 2(3).  In delineating the Coast Guard's authority, Congress divided the types of vessels into two classes, inspected and uninspected vessels.  *Chao v. Mallard Bay Drilling, Inc.,* 534 U.S. 235, 122 S. Ct. 738, 742 (2002).  It is undisputed that if a vessel is an inspected one, then the Coast Guard regulations preempt OSHA's regulations. *Id.* at 743.  However, if the vessel is an uninspected one, the Supreme Court has explained that OSHA's regulations are not preempted unless the Coast

3

No. 17-30638

Guard has exercised its authority "either by promulgating specific regulations or by asserting comprehensive regulatory authority over a certain category of vessels." *Id.*

As set forth above, Thomas contends that the district court erred in holding that the HERCULES 264 was an "inspected" vessel. Congress has set forth a specific list of 15 types of vessels that are deemed inspected vessels. *See* 46 U.S.C. § 3301 (1)-(15).[1] In that list, mobile offshore drilling units (such as the HERCULES 264) are not set forth as a vessel subject to inspection. *Id.* The statute also provides that an "'uninspected vessel' means a vessel not subject to inspection under section 3301 of this title that is not a recreational vessel." 46 U.S.C. § 2101(43). Accordingly, because mobile offshore drilling units are not listed as an inspected vessel under the statute, the HERCULES 264 is an "uninspected" vessel.

Here, the district court, relying on documents in the record showing that the Coast Guard had issued a certificate of compliance and a report of inspection for the HERCULES 264, found that it was an "inspected" vessel. Before the district court, Hercules primarily argued that the drilling rig was an "inspected" vessel and that Thomas's contrary assertion was the result of Thomas's "defective review of documents produced by Hercules and a flawed use of the [Coast Guard] website." ROA 17-30638.446. On appeal, although Hercules first argues that the vessel is an "inspected" one, the brief also argues

---

[1] Section 3301 states that "[t]he following categories of vessels are subject to inspection under this part:"

> (1) freight vessels (2) nautical school vessels (3) offshore supply vessels (4) passenger vessels (5) sailing school vessels (6) seagoing barges (7) seagoing motor vessels (8) small passenger vessels (9) steam vessels (10) tank vessels (11) fish processing vessels (12) fish tender vessels (13) Great Lakes barges (14) oil spill response vessels (15) towing vessels.

4

that although the vessel is an "uninspected" one under the statute, because the Coast Guard regulates drilling operations on the outer continental shelf, the Coast Guard regulations preempt OSHA's regulations. Brief at 18 (citing *Chao*, 534 U.S. 235, 122 S. Ct. at 743–44).[2]

The documentary evidence in the record demonstrates that the HERCULES 264 was a mobile offshore drilling unit located on the outer continental shelf. The Supreme Court has noted that "the Coast Guard has exercised its statutory authority to regulate a number of specific working conditions on certain types of uninspected vessels. For example, the Coast Guard regulates drilling operations that take place on the outer continental shelf." *Id.* at 743. Moreover, the Coast Guard has issued regulations with respect to the design and equipment standards for mobile offshore drilling units, including the construction of accommodation spaces on those units. *See* 46 C.F.R. § 108.197. The regulations also include design requirements with respect to wash spaces, toilet spaces, and shower spaces. *See* 46 C.F.R. § 108.205. We are persuaded that the promulgation of these regulations constitutes an exercise of the Coast Guard's authority sufficient to preempt OSHA's regulations. *Chao,* 534 U.S. 235, 122 S. Ct. at 743. Thus, we conclude that the district court did not err in finding that the Coast Guard regulations preempted OSHA's regulations.

C.    Jones Act Negligence and Unseaworthiness Claims

Under the Jones Act, a seaman is entitled to recovery if the shipowner's negligence is the cause, in whole or in part, of the seaman's injury. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997) (en banc). The

---

[2] Thomas argues that Hercules forfeited this argument by failing to raise it before the district court. However, the issue of whether the HERCULES 264 was an inspected or an uninspected vessel was joined before the district court, and the case relied upon on appeal was cited before the district court. *Chao,* 534 U.S. 235, 122 S. Ct. 738. Under both of the theories argued by Hercules, the end result is that OSHA regulations are preempted.

seaman must bring evidence showing an unsafe condition existed and that the owner either knew or should have known about it. *Perry v. Morgan Guar. Trust Co. of N.Y.,* 528 F.2d 1378, 1379 (5th Cir. 1976).

For a vessel and its appurtenances to be seaworthy, it "must be reasonably suited for the purpose or use for which they were intended." *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988). It is a shipowner's duty to provide a seaworthy vessel. *Id*. To prevail on a claim of unseaworthiness, however, a seaman must satisfy a higher burden of causation than in a Jones Act claim. *Id.* The seaman must prove that the "unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Id*. Here, both Thomas's negligence claim under the Jones Act and the claim that the HERCULES 264 was unseaworthy are based on the raised doorsill that Thomas asserts caused her fall.

Thomas contends that the district court erred in concluding that there was no evidence that the raised doorsill constituted a tripping hazard. Thomas asserts that the district court's "conclusion that the HERCULES 264 was an inspected vessel begins to define the error in the District Court's rejection of the unseaworthiness and negligence claims." Thomas's argument is that the district court should have concluded that the HERCULES 264 was an uninspected vessel and that OSHA regulations were therefore not preempted. We have already rejected Thomas's contention that the district court erred in finding that the OSHA regulations were preempted. Accordingly, this argument falls under its own weight.

No. 17-30638

### 1.  Negligence

It is undisputed that the doorsill was raised above the floor two inches high, and it was approximately three and a half inches wide.  Thomas contends that the doorsill was an unsafe condition.  However, "[u]nsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment."  *Clark v. America's Favorite Chicken Co.,* 110 F.3d 295, 297 (5th Cir. 1997).

The district court ruled that there was no evidence of Hercules's negligence because Thomas could point to no: (1) violation of a Coast Guard regulation; (2) evidence that there had been other incidents of tripping over the raised doorsill; or (3) expert testimony that the raised doorsill was an unsafe condition.[3]  We agree.  Because Thomas wholly failed to offer any evidence to show that the raised doorsill constituted an unsafe condition, the district court properly granted summary judgment as to the negligence claim brought under the Jones Act.

### 2.    Seaworthiness

The district court found that Thomas had failed to present any evidence (except her own opinion) that the raised doorsill was a defective condition that rendered the vessel unseaworthy.  The district court also pointed out that the doorsill did not violate a Coast Guard regulation.  Indeed, it was undisputed that the Coast Guard regulations may require higher doorsills than the one at issue at various locations on the HERCULES 264.  The district court did not err in ruling that Thomas had failed to create a genuine issue of fact with

---

[3] *Cf. Jussila v. M/T Louisiana Brimstone et al.,* 691 F.2d 217 (5th Cir. 1982) (affirming the denial of a motion for directed verdict because the seaman and the shipowner provided expert witness testimony regarding whether a metal rim that arose vertically from the deck constituted an unsafe condition, which demonstrated that reasonable minds could differ as to the shipowner's negligence).

respect to whether the raised doorsill rendered the HERCULES 264 unseaworthy.

### D. Maintenance and Cure

Thomas contends that the district court erred in sustaining Hercules's defense to her claim for maintenance and cure benefits. In general, an employer "must pay maintenance and cure to any seaman who becomes ill or suffers an injury while in the service of the vessel, regardless of whether either party was negligent." *Bertram v. Freeport McMoran, Inc.*, 35 F.3d 1008, 1012 (5th Cir. 1994) (citation and internal quotation marks omitted). However, an employer is entitled to investigate a claim for maintenance and cure benefits and may rely on specified legal defenses to deny a claim. *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 171 (5th Cir. 2005) (citing *McCorpen v. Cent. Gulf S.S. Corp.*, 396 F.2d 547 (5th Cir. 1968)). The *McCorpen* defense is applicable when an "injured seaman [has] willfully concealed from his employer a preexisting medical condition." *Id.* The *McCorpen* defense has three prongs that must be met. The employer must show that (1) the seaman intentionally misrepresented or concealed medical facts; (2) the nondisclosed facts were material to the employer's decision to hire the seaman; and (3) a link between the withheld information and the injury that is the subject of the complaint. *Id.*

In conjunction with her application for employment with Hercules, Thomas was required to complete a medical questionnaire. Thomas signed the portion of the questionnaire that stated that she had "never sustained an injury or sought medical attention for a physical problem (except for sickness or flu, etc)." ROA 17-30638.308. On a separate form that was given to the physician who performed her pre-employment physical, Thomas checked "NO" when asked whether she had ever been treated for: "Disorder of the neck/back,

spine, knee, bones, arthritis, muscles, joints, and leg or arm pain." ROA 17-30638.309.  This form was dated November 13, 2012.  She also checked "No" to the question "Have you ever been told by a doctor that you have any problems in your back/neck?"

However, during Thomas's deposition, she admitted that on May 4, 2008, she had been in a car accident that injured her back.  ROA 17-30638.238–39.  Thomas also testified that she was in a car accident on April 25, 2009.  ROA 17-30638.239–40.  After this accident, she reported pain in her left shoulder, neck, and lower back.  ROA 17-30638.239–41.

Thomas does not challenge the district court's finding that the first prong of the defense was established because she concealed medical facts.  Thomas does, however, argue that the district court erred in its determination regarding the second and third factors.

With respect to the second factor, Thomas contends that the district court erred in finding that the concealed facts regarding her previous injuries were material to Hercules's decision to hire her.  In the district court, Hercules submitted the affidavit of its Human Resources Director, Eric Ferguson ("Ferguson").  In the affidavit, Ferguson stated that had Hercules "been aware of Ms. Thomas' prior history of injuries, it would have inquired further concerning her medical history prior to hiring her."

Nonetheless, Thomas argues that there is a fact issue with respect to whether the concealed medical facts were material to Hercules's decision to hire her.  She points out that prior to her employment, she passed the functional capacity evaluation required by Hercules.  Thomas states that she was tested for, among other things, upper and lower extremity range of motion, neck range of motion, straight leg raise and flexibility, upper and lower extremity strength, standing on heels and toes, and squatting.  She also had

to stand or walk for at least two hours without a break. Additionally, she had to lift various weights and be able to carry them up and down the stairs. Thomas states that she passed all parts of the physical examination. After the examination, Thomas was deemed "able to work without restrictions." Thomas argues that because she passed extensive physical testing and was found fit to perform the job of galley hand, she has raised a fact issue as to Ferguson's statement that Hercules would have required further medical information had it known of her previous injuries.

This Court has explained that if an employer asks a specific medical question and that "inquiry is rationally related to the applicant's physical ability to perform [her] job duties," then that information is "material" under the *McCorpen* defense. *Brown,* 410 F.3d at 175. Here, Hercules's medical questionnaire specifically asked, among other things, whether Thomas had any back or neck injuries. Thomas does not argue that these questions were not rationally related to her physical ability to perform her duties as a galley hand. Instead, as set forth above, Thomas argues that because she passed the extensive physical testing, she has raised a fact issue with respect to Ferguson's statement that Hercules would have required further medical information had it known of her previous injuries. This Court has rejected an argument similar to the one that Thomas now raises. *Brown,* 410 F.3d at 175. In *Brown,* we opined that the fact that the employee could perform the heavy labor tasks when he was first hired is "irrelevant" because the employer "based its hiring decision (at least, in part) upon whether applicants had 'Past or Present Back and Neck Trouble.'" *Id.* Likewise, in the case at bar, the fact that Thomas could perform the physical tasks during the evaluation is "irrelevant" because Hercules based its hiring decision at least in part upon whether Thomas had previous back and neck injuries. Accordingly, the district

court did not err in finding that the concealed injuries were material to Hercules's decision to hire her, thus satisfying the second prong of the defense.

With respect to the third prong, Thomas argues that the district court erred in finding that there was a causal connection between her prior injuries and her current injuries. We disagree.

As previously set forth, on May 6, 2008, Thomas was in a car accident and sought treatment at the emergency room of the Ville Platte Medical Center. She reported pain in her upper, mid, and lower back. She also reported pain up and down her right side, including her arm, hip, thigh, knees and ankle. She was given pain medication. The next month, Thomas went to see Dr. Reginald Segar and reported pain in her right shoulder. On October 13, Thomas saw Dr. Segar and reported pain in the following areas: on the right side of her face and neck, right arm, right hip, right leg, and lower back. Thomas reported that she was unable to work because of the pain. Dr. Segar prescribed several medications.

Dr. Segar continued to see Thomas over several months. In October, Dr. Segar wrote that his "impression was that of multiple myofascial injuries to the neck and lumbar areas." Dr. Segar provided refills for some of the medications. Dr. Segar also wrote that Thomas had "probably reached maximum medical improvement. This patient will have to learn to live with the pain she is still experiencing five months after the accident."

As previously noted, Thomas was involved in a second car accident on April 25, 2009. Thomas went to the same emergency room and reported pain in her neck and lower back. On May 1, Thomas saw Dr. Segar and reported that she was experiencing headaches, neck pain, dizziness, nausea, and lower back pain radiating into her left leg. Dr. Segar prescribed medication. She returned to Dr. Segar on May 15, and reported that her lower back pain was

worse and her neck pain was radiating into her left shoulder. Dr. Segar advised proper body mechanics and stretching exercises to do at home. She returned on May 29, and although her lower back was still hurting, her neck pain had improved. On July 8, Thomas saw Dr. Segar and reported that she was continuing to have pain in her neck and back and numbness in both legs. His physical exam of Thomas tenderness revealed tenderness in her neck, trapezius, and lower back. Although her pain had not resolved, Dr. Segar discharged Thomas because she insisted that she needed to return to work.

With respect to the injuries allegedly caused by her fall on the HERCULES 264 in May of 2013, Thomas reported having pain in her neck, lower back, and right leg. She received injections but received no relief from the pain. Thomas was diagnosed with herniated disks.

Thomas asserts that the district court erred in holding that there was a causal connection between her previous injuries and her current injuries based on the court's finding that the injuries sustained were in the "same region of her body." This Court has explained that an employer "need not prove that the prior injuries are the sole causes" of the current injuries. *Brown,* 410 F.3d at 176. We further explained that there "is no requirement that a present injury be identical to a previous injury." *Id.* (internal quotation marks and citation omitted). In *Brown,* we held that because the employee's "injuries were to the same location of the lumbar spine," the employer had established the causal link between the concealed information and the new injury. *Id.* Here, Thomas's previous, concealed injuries and her current injuries both involve her lower back and neck. Under these circumstances, we conclude that Hercules has satisfied the third prong by showing a causal link between the prior injuries and the current injuries. Thus, the district court properly held that

the *McCorpen* defense entitled Hercules to summary judgment as to the maintenance and cure claim.

III.    CONCLUSION

For the above reasons, the district court's judgment is AFFIRMED.