TCW SPECIAL CREDITS, a California General Partnership, as Agent and Nominee, Plaintiff,

v.

. F/V KASSANDRA Z, OFFICIAL NO. 553390, et. al., HER ENGINES, NETS, FURNITURE, etc., *In Rem* KASSANDRA Z FISHING COMPANY, INC., a commonwealth of the Northern Mariana Islands Corporation, *In Personam*, Defendants.

---

ANTHONY SARDINA, Plaintiff-in-Intervention.

High Court of American Samoa
Trial Division

CA No. 92-96

July 6, 2001

106

Before KRUSE, Chief Justice, TUAOLO, Chief Associate Justice, and ATIULAGI, Associate Justice

Counsel: For Plaintiff-in-Intervention Sardina, Thomas O. Gilmore,
Roy J.D. Hall, Jr
For Defendant Kassandra Z, Michael A. Barcott, Virginia L.
Sudbury

## OPINION AND ORDER

On January 17, 1996, Mr. Anthony Sardina ("Sardina") slipped and fell
on his backside in the passageway of the F/V Kassandra Z tuna seiner
("Kassandra Z"). Sardina, who was a licensed Master and Navigator on
the Kassandra Z at the time, claims that he suffered physical injuries
from the fall so severe that he has been unable to continue his career in
commercial fishing. Sardina alleges that the ship was unseaworthy
because of a faulty refrigeration unit that caused water to leak, rendering
the floor slippery and hazardous, and causing him to slip, suffer
concussion, and injure his back. He further argues that defendants are
negligent under the Jones Act, U.S.C. § 688, because of their failures to
fix the refrigeration unit and to cover the floor with non-skid strips.
Sardina additionally prays for maintenance and cure benefits and
compensatory damages. The vessel Kassandra Z has been arrested and
sold, against which proceeds Sardina wages these claims.

We note jurisdiction under A.S.C.A. § 3.0208(a)(3); the Jones Act, 46
U.S.C. § 688; and T.C.R.C.P. 9(h). *See Clifton v. Voyager, Inc.*, 29
A.S.R.2d 80, 86-87 (Trial Div. 1995).

### **Findings of Fact**

At 5:45 p.m. on January 17, 1996, Sardina showered, dressed, put on his
customary Scott-brand flip-flops, and walked down the ship's
passageway toward the laundry room to move his clothes from washer to
dryer. He carried nothing of note. On the way, Sardina noticed the
ship's cook preparing dinner in the galley adjacent to the passageway.
The seas were calm, and the weather was good. Sardina returned to his
quarters. Then, about 6:30 p.m., Sardina headed for the laundry room to
fetch his clothes. He safely traversed the first part of the passageway,
which was covered with non-skid strips. These were approximately five
inches thick, one foot apart, and extended the width of the walkway.
Sardina then stepped over a doorframe leading into the bare area of the
passageway adjacent the galley. The ship's crew had apparently run out
of non-skid strips in the midst of installing them.[1] The exposed floor

---

[1] The evidence indicates that the Kassandra Z shipowner had long ceased
to respond to officers' requests and notifications for parts, repairs and
paint. It is uncertain whether more nonskid strips were specifically
requested.

material before the freezer was terrazzo, a composite material typical of fishing vessels that is used to cover steel decks.

Sardina then noticed the ship's dog, Julie, sitting by the galley in the passageway. He took about six steps, placed one foot in a wet area just before the freezer door, and promptly slipped backwards. He landed on his back and slammed his head on the deck in uncertain order. He lost consciousness. When Sardina awoke, his back was wet.

The gasket of the freezer door had deteriorated. The captain had requested a new rubber gasket from the owners of the vessel, but this request had not been heeded. The defect in the gasket caused below-freezing air to escape and collide with the humid equatorial airs of the South Seas. Water condensed on the stainless steel freezer door, corroding it, causing rust, and leaking water onto the floor. Six crewmembers had slipped before the freezer door previous to Sardina.

Sardina could not get up due to dizziness, excruciating pain, and disorientation. He unsuccessfully attempted to pound on the bulkhead for attention. He was finally found by a crew member who immediately notified the cook, other crew members, and Fish Captain Gjoko Milisec, who alternated that position with his brother Goren Milisec. Sardina could not move, but was placed in a chair and lifted up by crewmen. When the chair could not get through the doorway, crewmen hefted Sardina by his feet and arms and took him to his room, where he returned about 7:30 p.m.

Because of pain in the lower back, buttocks, and legs, as well as nausea, dizziness and headaches, Sardina called the Maritime Health Service at 9:45 p.m., a twenty-four-hour medical consulting service for seamen. He spoke to Dr. Keith McGill, who prescribed medicine and advised Sardina to seek medical care at the nearest port due to concerns over unconsciousness and possible brain damage resulting from the fall.

The Kassandra Z then headed to Rabaul, New Guinea, the nearest port. An agent for Arnold and Arnold Insurance Company ("Arnold and Arnold"), the insurance company for Kassandra Z, met Sardina at the boat and arranged for him to visit the hospital there, Sardina was examined by Dr. J. Pulau, who performed back x-rays of Sardina, diagnosed him with a compressed disk in his back, and advised him to receive a proper spinal examination and CAT scan of the back and head region.

On January 25, 1996, Sardina flew back to Los Angeles. More or less upon return to San Diego, Sardina moved in with his parents due to financial difficulties. He has paid neither housing nor board expenses

while living with his parents. In the U.S., Sardina saw Dr. Henry Joseph Laufenberg ("Dr. Laufenberg") a general surgeon referred by Arnold and Arnold. Less than two weeks after the accident, on January 29, 1996, Dr. Laufenberg diagnosed Sardina with a contused scalp, or a swollen, raised area of about eight by six centimeters on the head that appeared about 50% reduced from its probable original size. A CAT scan performed on Sardina's lumbar spine on January 30, 1996, revealed arthritic process, or slight narrowing of the bone, and two herniated, bulging discs.

In the next three months, from February to April, Sardina saw Dr. Laufenberg four more times. Dr. Laufenberg diagnosed Sardina with having a cerebral concussion with post concussion syndrome,[2] severe cervical sprain, lumbar sprain, and possible tarsal tunnel syndrome in the right foot. He prescribed pain medications to Sardina, and recommended physical therapy and stretching exercises. He referred Sardina to pain specialist Dr. Kevin Barkal, neurologist Dr. Bruce Lasker due to the head injury and memory and learning problems, and to podiatrist Stephen Altman because of problems with Sardina's feet.

Dr. Lasker's laboratory report suggested tarsal tunnel syndrome in the right foot, which is pinching or irritation of the posterior tibial nerve, the neurovascular bundle that supplies blood to the foot, which pinching causes numbness, sensitivity, and burning pain in the ankle similar to carpal tunnel syndrome. Dr. Altman confirmed the tarsal tunnel syndrome and recommended an orthotic insert as an alternative to ankle surgery. Dr. Lasker also conducted a Magnetic Resonance Imaging (MRI) test on Sardina's lumbar spine, which indicated mild degenerative disc changes within the lower lumbar spine with a mild disc bulge.

By June through August of 1996, Sardina still suffered from memory problems, learning problems, and continuing pains in his legs. He had also gained more than twenty pounds since the accident, registering 256 pounds or; June 26, 1996, compared to his initially recorded weight of 232.5 pounds. Sardina was bedridden for several days in July due to unrelenting pain.

By August 21, 1996, Sardina still reported pain in his neck and lower back, as well as psychological symptoms such as getting lost en route to his cousin's house, depression and feelings of worthlessness. It was at that time that Dr. Laufenberg recommended that Sardina receive epidural injections from Dr. Lasker, as had been requested by attorney Dale Amman from Arnold and Arnold on June 28, 1996.

---

[2] Post-concussion syndrome occurs when high impact to the back of the head causes problems to complex attention functions and mental processing, including memory problems but not brain damage.

Sardina received epidural injections in October and November 1996, with only temporary abatement in his pain and memory problems. By March 12, 1997, a year and two months after the accident, Sardina reported that the headaches, lower back pains, and memory problems had not improved after the epidural injections. He further registered an increased weight of 269 pounds, or 36.5 pounds heavier since his initial visit.

In April 1997, Sardina was again referred to a neurologist, a podiatrist, and a pain specialist. For back treatment, Dr. Laufenberg referred Sardina to orthopedist Dr. Richley, who specializes in trauma and back pains. Sardina visited Dr. Richley on June 3, 1997. Dr. Richley conducted a physical exam of Sardina including a straight leg-raising test to reveal damage to Sardinas cranial nerves. He initially diagnosed Sardina with post concussion syndrome, lumbar-disk syndrome, and back and leg pain caused by lumbar-disk injury.

An MRI was conducted on June 25, 1997, Dr. Laufenberg and Dr. Richley found this MRI to evidence interdiskal disruption with herniation in the L4 and L5 disk materials. Dr. Laufenberg opined that Sardina by this point had failed medical therapy, and placed him on pain medications. He further stated that the trauma could have caused degenerative effects, and recommended back surgery to cure the problem. Dr. Richley also recommended back surgery to appease Sardina's back pain and allow him to return to work. However, surgery was not performed because the shipowner of Kassandra Z refused to release insurance funding. If the surgery had been performed, according to Dr. Richley's testimony, the pain would have subsided sooner and Sardina would have been back to work.

Unable to obtain insurance funding despite retaining an attorney and making numerous requests to Arnold and Arnold, Sardina suffered pain, problems walking, nighttime awakening, depression and general frustration for the following two years. He regularly took Tylenol and Vicodin, and attempted to exercise.

Throughout 1998, Sardina complained that the pain was getting worse, spreading through his neck, back and left and right legs. He also complained of muscle stiffness in the mornings, inability to sit for more than 40 or 50 minutes, and memory and learning problems. He took Vicodin only when the pain became extreme. On November 18, 1998, at Sardina's request, Dr. Laufenherg evaluated Sardina for eligibility for a disability parking card. Dr. Laufenberg found Sardina unable to walk the distance to get into school or a store, and Sardina procured the card.

Until December 1999, Sardina's daily experience of pain in the lower

back and extremities, numbness in the buttocks, thighs, instep and toes continued, though it appears to have fluctuated in intensity. The mental confusion did clear up, and Sardina continued pain medication and physical therapy.

Finally, on December 7, 1999, Dr. Richley performed "minimally invasive spinal surgery" on the L3-L4 and the L4-L5 disks in Sardinas back. This involved lasers, rather than the more traditional, expensive and drastic measure of surgically opening the back to take the problem disk out. Dr. Richley testified that he preferred laser surgery for Sardina because it was an outpatient surgery, and enabled the disk to remain in Sardina while removing and firming up the material inside it.

After surgery, Sardina reported some back pain but no leg pain. On December 21, 1999, Dr. Richley found Sardina to be relieved of sciatica and numbness, and he prescribed therapy. In January 2000, Sardina reported to Dr. Laufenberg that his pain was gone. On February 21, 2000, Dr. Richley found no back or leg pain, nor neurologic deformities. By March 8, 2000, Dr. Laufenberg found Sardina fully recovered, even in terms of memory and learning disabilities, and discharged him.

All expert medical testimonies to the court agree that Sardina is recovered enough to resume most normal, daily activities. The laser surgery has relieved the symptoms of interdiskal disruption caused by the January 17, 1996, fall on the Kassandra Z. Sardina must, however, refrain from prolonged standing, continuous walking on uneven surfaces, or lifting heavy objects. For these reasons, he can no longer work on a fishing boat.

A. Work History and Prospects

Since 1977, Sardina has served on at least fourteen separate vessels. He received his U.S. Coast Guard master's certification in 1986 for up to 1600 gross ton inspected vessels upon the ocean, and up to 5000 ton uninspected vessels. He held this license until his injury. When not fishing, Sardina has held a number of short-term non fishing jobs, predominantly sea-related, including work as a captain on touring vessels for companies such as the San Diego Harbor Excursion and Catalina Cruises. He also worked as a hydro flow captain at Sea World, as a navigator on the submarine tender Edison Chouset, and as captain of a Long Beach crew boat transporting personnel to oil rigs. Sardina held a limited number of non-fishing industry jobs, including selling cars at John Hine Pontiac and the Westcott Mazda dealers, and working for relatives at a delicatessen. He was employed on the Kassandra Z as master, which position entailed in Sardina's own words, "complete responsibility for vessel and crew, to make sure the vessel gets to

wherever the fishing captain wants it to go safely and in one piece."

Sardina is a high school graduate, and holds U.S. Coast Guard licenses for first mate and master, including training in celestial navigation, some engineering, and first aid. He now holds his pilot's license in aviation, and in 1999 became licensed as a flight instructor.

Between the accident and a deposition taken on October 14, 1997, Sardina was unable to seek employment due to physical pain and depression. Nor was he able to partake of the few leisure activities he once enjoyed, such as water skiing or working on his car despite daily dosages of Vicodin, Tylenol and aspirin for pain relief. As of trial, Sardina was able to work as a host at a karaoke bar and as a part-time flight instructor.

## I. Unseaworthiness

 Sardina's first claim is that the vessel Kassandra Z was unseaworthy. Under general maritime law, a shipowner is absolutely liable for indemnity for injuries if these were received as a result of the unseaworthiness of the ship or failure to supply and keep in order the appliances of the ship. *Platt v. Chesapeake & 0. Ry. Co.*, 82 F. Supp. 968, 970 (D.C. Ohio 1948). Absolute liability for unseaworthiness, under admiralty law, is based on the protection of seamen who sign articles for a voyage and are then under the absolute control of a master with power to order seamen to do the ship's work in any weather, under any conditions, using such equipment as maybe furnished by the shipowner. *Offshore Co. v. Robison*, 266 F.2d 769, 781 (5th Cir, 1959). Due to the extreme hazards of living in a ship and the trust implicit in the obedience and physical deference given to the owners and officers of a ship, the shipowner's liability for personal injuries under the doctrine of unseaworthiness is strict, absolute, and without fault. *Reinhart v. United States, 457 F.2d 151, 152 (9th Cir. 1972).*

 The warranty of seaworthiness contemplates not only the turbulence of the oceans but also conditions peculiar to ships, where space and equipment must be utilized carefully to minimize accident-inducing hazards. *Delome v. Union Barge Line Co.*, 444 F.2d 225, 229 (5th Cir. 1971). Specifically, a shipowner has the duty to every seaman employed on board to insure that appliances are "reasonably fit for the purpose for which they were used." *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 213 (1963); *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960). This duty includes maintaining a ship's equipment in proper operating condition. *See Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 103-04 (1944). The failure of a piece of vessel equipment under proper and expected use is sufficient to establish unseaworthiness. *Lee v. Pac.*

*Far East Line, Inc.*, 566 F.2d 65, 67 (9th Cir. 1977).

A. Unseaworthy Equipment

We find that Kassandra Z failed to maintain the freezer in good condition. Sardina has more than amply proven through photographs, video and testimony that the gasket in the freezer door was broken before and at the time of his accident. We take judicial notice of the definition of "gasket" by the AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 749 (3d Ed. 1992), as "[a]ny of a wide variety of scabs or packings used between matched machine parts or around pipe joints to prevent the escape of a gas or fluid." The gasket of a freezer door is thus clearly intended to prevent the cold air of the freezer from escaping. The fact that the gasket on the Kassandra Z's refrigeration unit was broken, that rust appeared on the outside and bottom of the freezer door, and that at least six crew members had previously slipped in the wet area support our finding that, as a result of the broken gasket, condensation and leakage occurred.

The freezer door further appears to have been used in normal, expected ways. The cook was preparing dinner in his usual course just before Sardina slipped. Such habitual, dutiful work requires frequent entry and exit of the walk-in freezer adjacent the galley, in the passageway. The seiner was at rest in South Pacific seas, where great potential of condensation exists at any interstice between the omnipresent humid climate and the internal cooling system of a freezer. We have found that, as a matter of fact, leakage caused water to pool before the freezer. This fact, coupled with the kitchen logic of the South Seas, cements our finding that the area was made dangerous and unsafe by the freezer defect.

Under these circumstances, we find that the broken gasket rendered the freezer door unreasonably hazardous, especially since the ship was at work in the humid South Pacific, with great potential condensation. We thus render a finding of unseaworthiness.

B. Proximate Cause

■ To prevail on a claim of unseaworthiness, a plaintiff must show both unseaworthiness and proximate causation. *Nelsen v. Research Corp. of the Univ. of Hawaii*, 805 F. Supp. 837, 850 (D. Haw. 1992). The unseaworthy condition must have played a substantial part in bringing about or actually causing the injury, and the injury must be either a direct result or a reasonably probable consequence of the unseaworthy condition. *See Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1355 (5th Cir. 1988).

We are convinced that Sardina's slip and fall on the Kassandra Z on January 17, 1996, proximately caused his back injuries. Specifically, the testimonies of Dr. Laufenberg and Dr. Richley confirm that the fall substantially caused Sardina's post concussion syndrome, tarsal-tunnel syndrome, back injury and painful degeneration of the L4 and L5 spinal disks requiring surgical treatment. We discuss our findings in more detail, especially in lieu of the competing testimonies of Dr. Vance versus Dr. Richley, in the following section.

## II. The Jones Act

■ Sardina brings a tort claim under the Jones Act, 46 U.S.C.A. § 688, which provides a remedy for seaman injured in the course of their employment as a result of their employer's negligence. Prior to the passage of this provision, if a seaman suffered personal injuries in service of his ship, the ship and her owners were liable in admiralty for his maintenance and cure and for his wages, at least until the end of the journey, and for an indemnity for injuries if they were received as a result of the unseaworthiness of the ship or failure to supply and keep in order the appliances of the ship. *Platt*, 82 F. Supp at 970. The seaman could not, however, recover for injuries sustained through the negligence of the master or any member of the crew, beyond maintenance and cure. *Id.*

■ The Jones Act made applicable the Federal Employers' Liability Act (FELA), 45 U.S.C.A. § 51, to maritime law, thereby authorizing a right to recovery for seamen injured due to the negligence of their employer, its agents or employees. *Joyce v. The Atl. Co.*, 651 F.2d 676, 681 (10th Cir. 1981); *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 38 (1943); *De Zon v. Am. Pres. Lines*, 318 U.S. 660, 665 (1943); *Engel v. Davenport*, 271 U.S. 33, 35 (1926). Sardina brings his claim against Kassandra Z for Jones Act negligence.

## A. Standard of Care

■ Under the Jones Act standard of negligence, a shipowner has an obligation to seamen that is substantially greater than the obligation of ordinary employer to employees. *Interocean S.S. Co. v. Topoloisky*, 165 F.2d 783, 784 (6th Cir. 1948). The shipowner has an absolute, nondelegable duty to exercise reasonable care in furnishing seamen a reasonably safe place to work, a seaworthy ship and safe equipment. *Miranda v. Texaco, Inc.*, 299 F. Supp. 658, 661 (E.D. Pa. 1969); *Casbon v. Stockard S.S. Corp.*, 173 F. Supp 845, 848 (D. La 1959). The shipowner must use due diligence in providing these. *Rouchleau v. Silva*, 217 P.2d 929, 932 (Cal. 1950). The shipowner-employer need not absolutely guarantee the safety of the vessel, but must take reasonable precautions to secure safety. *Wilson v. Societa Italiana d Armatnento,*

279 F. Supp. 945, 947 (D. La. 1968). Breach of this duty gives rise to the action based on negligence. *Id.*

■ The evidentiary showing required to establish negligence requires actual or constructive knowledge, while the evidentiary showing to establish unseaworthiness is predicated without regard to fault or the use of due care. *Lee*, 566 F.2d at 67. Even given this higher standard, we find that Cassandra Z breached its Jones Act duty to maintain a reasonably safe, seaworthy place in which to work in two ways. First, it breached its duty to maintain safe freezer equipment by not providing essential parts. Second, it failed to supply relatively inexpensive non-skid safety strips in the area before the freezer door.

### 1. Freezer Equipment

■ First is the issue of whether the duty to provide a reasonably safe vessel applies to defective freezer equipment. In applying the Jones Act, courts have held it to be an absolute, nondelegable duty of the shipowner to maintain a reasonably safe vessel, extending to equipment and appliances used on the vessel. These must be proper and free from defects that are known or which should have been known in exercise of due care. *Havens v. F/T Polar Mist*, 996 F.2d 215, 218 (9th Cir. 1993). Due and reasonable care must be taken to maintain the appliances in seaworthy, safe and proper condition. *Pearson v. Tide Water Assoc. Oil Co.*, 204 P.2d 99, 103 (Cal. App. 1949).

■ We have found that Kassandra Z failed to use reasonable care in maintaining the ship's freezer equipment. We further find that Kassandra Z had notice of the defective freezer and of the resultant unsafe condition, and yet still neglected to use reasonable care in failing to supply such essential equipment. Fish Captain Gjoko Milosec testified that the shipowner failed to supply the necessary replacement gasket for the freezer despite his request. The fact that six seamen had slipped in the same location, and that a water trail was visible and obvious to one on the lookout for safety hazards, further confirms to this court the improbability of Kassandra Z's ignorance of the dangerous condition. Defendant's financial difficulties provide an explanation, but do not establish a defense for such an obvious breach of the shipowner's duty to maintain ship and equipment in reasonably safe and seaworthy condition.

### 2. Non-skid strips

The entire passageway, from the bottom of the wheelhouse starts to all three crews' quarters up to the area adjacent to the galley, was covered with non-skid strips. The question is thus whether defendants had a duty to provide non-skid strips in the latter section, specifically in the

walkway before the freezer. Or, in legal terms, whether the lack of preventive safety equipment in this case meets the "reasonably safe" requirement of the Jones Act.

 A shipowner does not have a duty to supply the best, newest, or perfect tools, gear, or appliances, so long as the gear supplied was reasonably safe and suitable. *Marshall v. Ove Skou Rederi A/S*, 378 F.2d 193, 197-98 (5th Cir. 1967). A shipowner is not required to provide an accident-proof ship nor the latest and best safety devices, but only to provide a safe place in which to work and safe and seaworthy appliances with which to do the work. *Senton v. United Towing Co.*, 120 F. Supp. 638, 640 (N.D. Cal. 1954); *Robichaux v. Kerr McGee Oil Indus., Inc.*, 317 F. Supp 587, 592 (S.D.N.Y. 1970).

The bare floor upon which Sardina slipped was made of a terrazzo material. The evidence shows that terrazzo deck floors ordinarily are not, in and of themselves, unsafe or slippery. Captain Harold Medina, who was a fish captain for more than 20 years and who served on safety commissions for the U.S. legislature as well as the National Academy of Science, testified that terrazzo decks are common on the interior of tuna seiners, and at least in 1969 were present on all vessels in the galley and hallways. Terrazzo is also a commonly used flooring material in and outside of on-land public spaces such as stores. *See, e.g., Foster v. Walgreen's Drug Stores, Inc.*, 468 So.2d 656, 657-68 (La. App. 1985). However, testimony by all "experts," including Captain Medina, Captain Kenneth Frahke and David Snow, indicate that terrazzo material becomes extremely slippery when wet, especially when combined with food particles and/or grease.[3] The very fact that the hallway was mostly

---

[3] The parties' efforts to demonstrate whether and how much the terrazzo deck floor was slippery, and whether and how much it was rendered more slippery by water, provided an entertaining diversion to an otherwise tedious proceeding. Plaintiff's expert, Captain Kenneth Franke, produced a spring scale to unsteadily drag a weighted rubber boot and then a flip-flop across a simulated floor surface. Defendant's expert, David Snow, carted a heavy piece of laboratory equipment, a "Brungraber Portable Articulated Strut Slip Tester," from Seattle, Washington, to demonstrate decimal point precision, but to the same unimpressive effect. Both parties then sought to undermine the full applicability of the other's test according to treatises, custom, basic physics, and logic.

"Science" may render a level of objectivity in particular settings, such as tests for blood alcohol content level, or calibration of instruments for critical engineering measurements in the airline or automobile industries. However, after hours of debate, the experts in this case have merely

covered in non-skid strips indicate an awareness and concern for the safety hazards of a slippery passageway.

Despite the slipperiness of bare, wet terrazzo floors, we have found no evidence to the effect that non-skid safety strips are required or used by industry standard and custom. We accept Captain Medina's testimony that bare terrazzo floors are considered reasonably safe and may be the norm on most ships. Thus, based on all evidence given, this court is neither qualified nor inclined to make the new finding, and create the new requirement, that shipowner have a duty to provide non-skid strips on their boats.

This case, however, involves two unique conditions of the Kassandra Z: (1) its passageway was entirely covered in non-skid strips except, notably, in the area before the faulty freezer; and, (2) that bare area was made unsafe by water leakage from that freezer. A wet walkway that is half-covered by non-skid strips is more dangerous than one that is not covered at all, or else fully covered. The person walking through such a walkway adapts to the higher friction of treading on safety strips; the feet are misled, and perhaps move too quickly than they otherwise would, or perhaps too surely. Then, suddenly, as the foot moves freely forward into the danger zone, it is caught reasonably, understandably, off-guard.

Perhaps the seaman is hungry and the dinner smells distract. Perhaps the dog sitting by the galley sports a new collar. Regardless of the unconscious cause, a seaman exercising reasonable safety may be completely ambushed by a water slick at the very point at which the floor suddenly, inexplicably, and counter-intuitively transitions to a state of smooth terrazzo. He may even flip, like Sardina, with a force strong enough to render a grown man unconscious. The inconsistencies of foothold along the passageway, coupled with the moist conditions of the freezer area, are determinative in this case. The fact that six crew members fell in the same area as the plaintiff is confirmation to this Court of the extreme, heightened, and surprising dangerousness of the

managed to quantify what is general knowledge and common sense, at least in Samoa where rain is frequent and often in torrential downpours. Simply put, all they have proved is that floors are slippery when wet, and all surfaces can get wet enough to slip on. It is not for the court to establish an objective numerical standard of "reasonableness," at which a wet floor of a certain construction suddenly moves from safe to unsafe status. Rather, we look at the particularities of this case to determine whether the walkway floor was reasonably safe. As stated in *Matson Nav. Co. v. Hansen*, 132 F.2d 487, 488 (9th Cir. 1942), the test of "reasonable safety" is not absolute but relative, and varies with prevailing conditions.

passageway.

 This case is one example of how a botched attempt to provide safety equipment may sometimes lead to a more dangerous situation than no attempt at all. *See Rebuke v. United States*, 8 F. Supp. 521 (D. La. 1934) (seaman, either through fault of dog or otherwise, lost balance and stumbled against chain safety railing and fell to a lower deck because chain was slack. Shipowner found negligent in permitting chain to remain slack, and such negligence was the proximate cause of the injuries). If the safety equipment that would have prevented the injury or death were impossible to install, then of course a shipowner cannot be held to have breached their duty of reasonable care. *Epling v. M.T. Epling Co.*, 435 F.2d 732, 735 (6th Cir. 1970). In this case, however, an insufficient number of non-skid strips had been provided. The strips are common and readily available, and easy to install. But they had not been sent. The failure to provide reasonable and procurable safety equipment, if such failure proximately causes the injury (the inquiry of the following section), is grounds for a finding of negligence. *Theall v. Sam Carline, Inc.*, 241 F. Supp. 748, 750 (D. La. 1963) (workman fell on catwalk and hand became entangled in an engine belt; shipowner found negligent for absence of guard rails); *Lunsford v. Halcyon S.S. Co., Inc.*, 354 F. Supp. 573, 576 (E.D. Pa. 1973) (shipowner negligent for failure to provide requested ladder to bunk where injury occurred on rolling, pitching ship). The lack of customary or statutory standards for such equipment does not preclude recovery for negligence. *See, e.g., Armit v. Loveland*, 115 F.2d 308, 312 (3d Cir. 1940).

We find that the lack of non-skid strips on a patch of bare floor made wet by a defective freezer, in the context of a walkway otherwise covered in non-skid strips, is an unreasonably unsafe condition in violation of a shipowner's absolute duty of care.

B. Proximate Cause

 FELA defines the scope of liability under the Jones Act. *Forgione v. United States*, 202 F.2d 249, 252 (3d Cir. 1953); *Wade v. Rogala*, 270 F.2d 280, 283 (3d Cir. 1959). Specifically, FELA § 51 provides that:

> Every common carrier by railroad . . . shall be liable in damages . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier.

45 U.S.C. § 51. The standard of causation under the Jones Act is therefore whether an employer's negligence caused, "in whole or in

part," the seaman's injury. Liability is broadly drawn and broadly construed, and is found where the employer's negligence played "any part, even the slightest, in producing injury or death." *Ribitzki* v. *Canmar Reading and Bates, Ltd. P'ship*, 111 F.3d 658 (9th Cir. 1997); *Lies v. Farrell Lines, Inc.*, 641 F.2d 755, 771 (9th Cir. 1981) (citing *Rogers v. Mo. Pac. R. Co.*, 352 U.S. 500, 506 (1957)); *Hampton v. Magnolia Towing Co.*, 338 F.2d 303, 305 (5th Cir. 1964). This "slight" standard of causation is often called "featherweight." *Id.*

We find that the dangerous condition wrought by the combination of a defective freezer and half-baked safety attempt at least in part caused Sardina's fall, which, in turn, caused injury to Sardina. Specifically, we find that the impact to Sardina's head caused him to have a cerebral concussion, and thus post concussion syndrome involving memory problems. The impact to his back caused cervical sprain, lumbar sprain, tarsal-tunnel syndrome on the right, foot and interdiskal disruption requiring back surgery. It is clear from the evidence that from the moment of impact, Sardina suffered from intense and prolonged pain. The initial diagnosis by Dr. Pulau in New Guinea, based on x-rays and later confirmed by CAT scans and MRIs, clarifies that the fall caused a compressed disk in Sardina's back. Dr. Laufenberg further diagnosed Sardina with a contused scalp and two herniated, bulging discs, in addition to cerebral concussion with post concussion syndrome, severe cervical sprain; lumbar sprain, and tarsal-tunnel syndrome on the right, resulting from the fall. The tarsal-tunnel syndrome was confirmed by Dr. Lasker. Dr. Richley further confirmed the extent of the back injury.

*1. Degenerating Disc*

Kassandra Z has raised some question as to whether the January 17, 1996, fall proximately caused the injuries to Sardinas spine, specifically the herniations in Sardina's L3-4 and L4-5 disks. Specifically, it has brought forward the testimony of Dr. Raymond Vance, who stated that the herniations in the L3-4 region are actually the cumulative result of aging and the degenerative effect of engaging in activities as stressful as riding in a fishing boat on pounding waves. Dr. Vance pointed to the CAT scan conducted 13 days after the January 1996, accident, and stated that it showed nothing but some wear and tear in the L3-4 region. Rather, it took sixteen months for the herniated disc to appear.

Kassandra Z also brought forth evidence of a slip-and-fall knee injury suffered by Sardina in October of 1982. Sardina had been ordered to scrub the engine room of the MJ Souza, and slipped on oil and grease, catching his knee and falling on his back. Medical records from that incident indicate that Sardina's discs were already subject to degeneration not related to the accident but rather to regular aging.

Specifically, x-rays dating October 15, 1982 showed some spurring of the L3-4 disk, and a CAT scan of October 29, 1982 showed diffuse contouring of the disk and mild degeneration. Although no significant back injury was diagnosed in 1984, only back strain not requiring surgical treatment, these medical records purport to show that the damage done to Sardina's back was due to his own physical aging process and fishing lifestyle, and would have happened without the January 17, 1996 fall. In Dr. Vance's view, the L3-L4 disk deterioration was not a result of January 1995 injury, but is rather a progressive injury, where the fall was the straw that broke the camel's back. Dr. James Nelson, who examined Sardina at the request of Kassandra Z, further viewed the injury as an event that should only have taken 16 weeks to heal.

We view this theory of Sardina's progressive spinal deterioration as valuable for showing only that Sardina may have been somewhat more susceptible to back damage from a slip and fall, especially a fall so severe that impact to the head caused unconsciousness. The theory does not, however, disprove the causative effect of the fall. Dr. Vance's conclusions as to Sardina's physical condition as of January 1996 are based on 1982 data. We therefore view it as speculative at best. We are satisfied by Dr. Richley's explanation of Sardina's condition as an interdiskal disruption, where a sudden, obvious accident caused mechanical injury by deforming the disk, which then gradually decayed and deteriorated in progressive stages. We accept Dr. Richley's testimony to the effect that the water chemistry in the affected disk was rendered abnormal by the impact and ultimately caused the disk to bulge into the nerves. Dr. Richley described the disk pain as like a boil, which causes pain in the disk and nerves, is affected because it is inflamed, and can be disabling especially when the victim coughs or sneezes. Pain fibers grow into the disk, spreading the pain across the back and down the legs in the pattern of the nerve. The nerve slowly decays and displays only subtle changes, which Dr. Richley confirmed Sardina to have experienced in an MRI scan conducted in 1999. Regarding Dr. Vance's assessment of the CAT scan performed after Sardina's fall, we rather tend to agree with Dr. Richley's statement: "Chemistry does not declare itself in 13 days."

Given the evidence presented to this Court, and the "slight" standard according to which we are charged to consider it, we are convinced that the negligence of Kassandra Z in failing to maintain the ship in safe condition was a proximate cause of Sardina's slip and fall that then resulted in disabling injuries to Sardina's back, leg and foot, including disruptions of the L3-4 and L4-5 disks, as well as temporary damage to his memory capacity.

121

## 2. Malingering

Kassandra Z has attempted to portray Sardina as an exaggerator of symptoms, as if his pain were not real and as if, in the words of Dr. Vance, the laser surgery affected on Sardina's back functioned primarily as a "placebo" rather than as a surgically necessary experience. Specifically, Kassandra Z points out that Sardina's condition changed over time. It further introduced neuropsychological testimony from Dr. Thomas C. Wegman regarding Sardina's possible "malingering," or propensity to exaggerate or lie about his painful condition.

Although there are bothersome points of inconsistency in Sardina's testimony, especially regarding the fate of the missing flip-flop,[4] we do not need to rule on his propensity to exaggerate given that the standard needed to prove proximate cause is only "slight." Whether Sardina's back pain was "stabbing" or "shooting" or "tickling" does not mitigate the finding that the dangerous condition aboard Kassandra Z caused well-defined, objective medical injuries and at least some period of immobilizing pain. Regardless of our subjective opinion of Sardina's character and reliability, the objective medical evidence of disk degeneration, bulging, nerve compression, and of the causative physical impact of this accident is overwhelming.

## C. Damages

We find, as a matter of fact, that the negligence of Kassandra Z in failing to maintain a safe working environment caused permanent injury to Sardina's back which has impaired his earning capacity. Specifically, the injury caused limitations to Sardina's physical condition which preclude him from returning to the tuna industry in general, in which he would have continued in his lucrative position as licensed master of a fishing vessel. Sardina's future earning capacity before the injury is diminishable, however, by his probable future earnings in aviation. *See, e.g., Senko v. Fonda*, 384 N.Y.S.2d 849, 852-53 (N.Y. App. Div. 1976).

## III. Computation of Economic Loss

Sardina brought forth the calculations of Robert Wallace, C.P.A. ("Wallace"), which were countered by Kassandra Z's accountant, Dana Basney, C.P.A. ("Basney"). We have reviewed the assumptions and

---

[4] Sardina testified in trial that he did not know what happened to the flip-flop, but stated that he had worn them out and threw them away. Later credible testimony by Captain Medina contradicted Sardina's account. Sardina's attorney had possession of the flip-flop and had, in Sardina's presence, shown it to Captain Medina.

figures of each side, and our assessment of the various factors involved in computing special damages (lost earnings prior to trial), general damages (impairment of earning capacity, pain and suffering), and comparative negligence is summarized as follows.

A. Tuna Fishing

■ A threshold issue in determining damages is whether the back injuries, especially the disk herniations requiring back surgery, prevent Sardina from returning to a career in the fishing industry.

Kassandra Z argues that Sardina was not a career tuna fisherman in that he had "just as much" employment running cruise ships and Sea World vessels, rig tenders and car sales while he earned his master's license, in addition to work in an Alaskan fishery. However, we are satisfied that Sardina's work record indicates a sustained commitment to tuna fishing despite periods of other, temporary employments in industries both related and unrelated to shipping and maritime activity. Sardina consistently worked in tuna seiners, though not for more than two trips each, and earned his master's license in 1985. We find that the wide variation in Sardina's other employment activities when not fishing rather emphasizes his lack of commitment to any other profession but fishing, to which he repeatedly returned. Sardina's procurement of a master's license, with its correlative cost and effort, is further proof of his commitment.

Kassandra Z further points to the testimony of Thomas Adams, a helicopter pilot on Kassandra Z, regarding a conversational confession in which Sardina struggled with his choice to be a fisherman, and in which he stated that he wanted out of the industry. Rather than evidence Sardina's lack of commitment given the overwhelming evidence of Sardina's fishing and maritime experience, this testimony seems rather to indicate how bound Sardina felt to the profession. We regard it as a workaday fact that a person may every now and then fervently wish themselves in a different profession than the one they are in, especially during times of stress. We are satisfied that Sardina was a career fisherman, albeit perhaps not the most apt, impassioned or commercially successful one.

Kassandra Z raises the further argument that Sardina is not barred from returning to fishing after the December 1999 back surgery. We find otherwise. The physical requirements of being a master on a tuna seiner involve driving a fishing boat, making a set, pushing fish and nets, climbing ladders and engaging in other manual activity requiring dexterity, torsion and strength. It is clear from all medical testimonies that, because of his herniated disks, and even with back surgery, Sardina

is not fit to continue his career as a fisherman. Although he is much recovered after the laser disk surgery in terms of no longer experiencing constant nerve pain, all medical testimony has convinced this court that Sardina is susceptible to pain and disk deterioration if subjected to the constant, rhythmic back pressures, the twisting, and the frequent and heavy lifting that is required of life on the seas as a fisherman.

We thus find Sardina to be precluded from returning to his career as a fisherman due to the January 17, 1996, slip and fall for which Kassandra Z is liable.

B. Captainship

A primary issue involved in computing the expected pay rate for lost earnings prior to trial as well as future earning capacity regards Sardina's contention that, had he been able to remain in the fishing industry, he would have been elevated to the more profitable post of captain on a tuna vessel. We agree with Kassandra Z, that this assumption is logically and practically unfounded. Sardina may have held the requisite qualifications as a licensed master; however, this alone would not have been enough to make a captainship a probable opportunity for Sardina. Kassandra Z has proven that the labor market for fish captainships is extremely tight due to nepotistic and ethnically nationalistic tendencies in choosing captains, as well as the fact that the number of American vessels engaged in tuna fishing has declined drastically in the past decade. We further point to Sardina's employment record for its lack of sterling consistency, and for the fact that his most recent employment was on the near-bankrupt, shoestring operation of Kassandra Z. We thus find Sardina's claim to a captainship entirely improbable.

C. Expected Pay Rate

An important factor for calculating Sardina's pre-trial lost earnings as well as future impairment of earning capacity is what base salary to assume had he not been injured. Wallace examined the average tonnage caught by tuna vessels in the western Pacific over 4, 10, and 17-year periods ($87,930, $90,288, and $81,000, respectively), as well as the average of Sardina's catch excluding 1992 ($63,784). Based on these four figures, he concluded Sardina's earning capacity to be $70,000. He further projected that, at the higher captain's rate, Sardina's earnings' capacity would have been between $136,000 and $155,000.

We have already found improbable Sardina's claim to a potential captainship, and so we disregard these latter inflated figures. Furthermore, we reject the $70,000 estimate by Wallace as too speculative and erroneously inflated. Wallace's indicators, upon which

the $70,000 is based, reflect the average tonnage caught by each tuna boat in the western Pacific, a statistic which does not reflect the shrinkage in actual *number* of tuna boats in the western Pacific, nor the consequent limitation on the available spaces for fishermen to participate in trips. The statistic thus does not adequately represent Sardina's particular circumstances, and cannot be considered a basis for forecasting his potential earnings.

Rather, we find that an average of Sardina's previous earnings constitutes an appropriate basis for calculating his potential salary. Therefore, we accept the figure offered by Basney of $61,159 per year, which is the average of Sardina's annual income between 1990 and 1995, inflated to 1995 levels. This figure includes the lower 1992 income which was excluded by Wallace for reflecting Sardina's vulnerability to the vagaries of the fishing labor market—a factor we find to be important and relevant in projecting potential income. The fact that this figure is lower than the average tonnage caught by tuna boats in the western Pacific further supports our findings that Sardina was not a fisherman on the "in"-track to a captainship, but rather that he was an outlier on the low-side of earnings, one of those unfortunates subject to the vagaries of labor demand in the fishing industry (especially the 1992 figure).

D. Benefits and Expenses

To determine Sardina's pre-trial lost earnings, Wallace considered other variables such as food and FICA benefits and business expenses. His estimation was that the value of food received would average about $3,000 per year, that FICA benefits would be about $4,000 per year, and that Sardina would incur business expenses of about $3,500 per year. We find that the value of food and business expenses are legitimate concerns but variable, speculative, and close enough in value so as to cancel one another out for practical purposes. We accept Wallace's addition of $4,000 in FICA benefits.

E. Social Security

We note that the figure used for Sardina's expected earnings, $61,159, is derived from an average of Sardina's adjusted gross income, from which Social Security payments appear to have already been withheld. We thus rule that social security taxes are not to be subtracted from Sardina's expected earnings as was done by Basney in computations for Kassandra Z.

F. Work Life Expectancy

Plaintiff's economist Wallace estimated that Sardina would have

remained a tuna fisherman through the age of 60.8. He called this figure "conservative," noting that the average retirement age of all fishermen who were part of Fisherman's Union Pension Trust was between 62 and 63. In opposition, Basney bracketed the retirement ages for persons in the fisheries between 42 for those in the Bering Seas to the age of 62 listed in the Department of Labor statistics, and calculated future earnings based on the lower number.

We take into account Sardina's increased susceptibility to back injury as indicated by the unfortunate disablement in this case, and by the report of Dr. Daniel P. Denenberg, which indicated a 1980 incidence of lower back pain and the serious slip and fall which occurred on October 11, 1982. The 1982 accident caused lower back and right knee pain, as well as post injury reports indicating "discogenic pathology," in terms of a "decrease in the L3-4 disk space with anterior osteophytes" and "a bulge of the annulus at the L3-4 level." Considering these indications of Sardina's increased susceptibility to injury in the work environment of a tuna seiner, even had the January 1996 fall not occurred, we think it highly improbable that Sardina would have remained in the fishing industry until the age of 62, or even the age of 57 at which Captain Medina retired. Captain Medina did not have serious physical problems and even now, at the age of 74, has only some knee problems. Indeed, for these purely physical reasons, we find it improbable that Sardina's physical health could have sustained working beyond the age of 52, which is the midpoint between 42, the Captain Ahab limit for strenuous work in the Bering Seas,[5] and 62, the Billy Budd limit for the most able-bodied of seamen.[6]

We further note with particular interest Captain Medina's testimony as to his four sons who were captains or chief engineers on his family boat who were forced to retire early due to the extreme competition in the fishing industry. We factor in the shrinking number of American fishing vessels that would further foreclose opportunities for gainful, sustainable employment. Finally, we note Sardina's fluctuating employment with various vessels and trips, rather than continuous and dependable contract with one fishing company or another, which would further constrain Sardina's employability in a tightening market. We believe the effect of these market forces would have counteracted Sardina's employability as a licensed master and shown commitment to fishing, and would have further depressed Sardina's potential work life by about five years. Due to physical and labor market constraints, therefore, we find that Sardina

[5] HERMAN MELVILLE, MOBY DICK (Reissued ed., Penguin Classics 1992) (1851).
[6] HERMAN MELVILLE, BILLY BUDD (Reprinted, Mass Market Paperback 1992) (1924).

would have been able to work in the fishing industry for only twelve years beyond the age of 35, and retired at the age of 47.

## G. Life Expectancy

Wallace indicated that Sardina's life expectancy would be age 76.66; Basney calculated it to be 73.6 based on the 1980 Commissioners Standard Ordinary Mortality Table. No arguments were made as to the preference of one age or the other. We accept the number given by Basney, 73.6, because he has cited a recognized authority, and because we have found it to be confirmed on independent, judicially recognizable grounds. *See, e.g.,* NAT'L VITAL STATISTICS REPORTS, Vol. 47, No. 28 (1997).

## H. Probable Future Earnings

Sardina's future earning capacity as a master on a fishing vessel is to be diminished by his probable future earnings in an alternate occupation. We find that Sardina is not foreclosed from other employment options, namely a career in aviation. Sardina holds an A.A. degree in flight operations, as well as several commercial licenses for several different aircraft. Since March 1999, he has done work as a ground instructor, while working on his flight instructor license. As of trial, Sardina was working four nights a week as a disc jockey and host in a karaoke bar, earning $8 per hour or $500 per month. He was also working as a flight instructor billing 10 to 15 hours a week, sometimes 20, at $18 per hour.

Plaintiff's vocational rehabilitation consultant Robert Hall, a professor at San Diego University, ran a battery of vocational skills tests on Sardina. He affirmed that the physical work restrictions described by Sardina's medical records preclude him from returning to work on fishing boats. He further testified as to Sardina's ready employability in a number of occupations other than the fishing industry, including the aviation industry and jobs involving the management skills of planning, organization, detail, interpersonal skills, paperwork and other administrative tasks. Because of the part-time nature of flight instructorship, Hall estimated that Sardina could make approximately $36,000 per year maximum from flight instructorship.

Dr. Edward Werkman, plaintiff's witness, a rehabilitation counselor, further testified to Sardina's ability to pursue a successful career in aviation. Dr. Werkman projected that the beginning of such a career would net $25,000 to $30,000, but that within five years, Sardina could be earning around an average of $60,000.

We take these two vocational expert testimonies into account. We further consider Sardina's mental capabilities as evidenced in his

purportedly earning straight A's in community college, as well as meeting the various licensing requirements, from the navigational and astronomical aspects of the master's license to the technical and practical detail required for flight and instructor licenses. We note, moreover, that compared to the limited, market-dependent, tightening labor market in the fishing industry for masters positions, the aviation industry proffers not only more positions—more than 350,000 by defendant's probably exaggerated estimates—but also more opportunities for learning and advancement. We also recognize that Sardina has begun this new career at mid-life, and so is not privy to the steeper upward trajectory of initial entrants to any labor market. We thus accept the average of Hall and Werkman's highest estimates, or $48,000, as the average expected salary for Sardina.

## I. Inflation and Present Value

Plaintiff's economist Wallace seems to account for present value in his calculations of future expected earnings, but he presents only a final figure without having made his method or amount transparent to the court. Defendant's economist Hall has adjusted for inflation at 4%, and for present discount value at 6%. The question thus arises as to whether and how to account for the economic effects of inflation and present discounting.

We know of only two previous opinions of this Court which explicitly discuss discounting to present value for tort awards. In *Fa`avae v. Am. Samoa Power Auth.*, this Court first, rather informally applied the policy of present discounting and inflation adjustment. 5 A.S.R.2d 53, 57 (Trial Div. 1987). *Fa`avae* assumed an interest rate of 6%, and applied cogent inflation to reach an "intuitively" correct figure. *Id.* at 57. We quote the language of the opinion here to emphasize the thoughtful, though seemingly extemporaneous manner way in which the Court applied its logic:

> [W]e will say that $25,000.00 is the financial loss that the (plaintiffs) suffered; however, it's more complicated than that because you've got to figure out the future discounted value of $25,000.00. I have checked A.L.R. Proof of Facts, which I thought would be good for something, which doesn't even turn out to be good for this; because all it tells is a whole lot of different rules about discounts depending on interest and inflation rates and depending on things like that. The figure that seems intuitively correct to me keeping in mind the facts that $1,000.00 isn't going to be worth $1,000.00 25 years from now and that it's not as simple as how long it takes the money to reach a certain amount at a specified interest rate assuming

an interest rate of six percent, which is what there is now, and assuming inflation of about what there is now, our best estimate is that the present discounted value of $25,000.00 or its real dollar equivalent in the future years is about $16,000.00. So we will award $16,000.00.

*Fa`avae*, 5 A.S.R.2d at 56-57. The Court further invited both parties to submit statistics tending to invalidate the calculation. It went on to say:

Obviously, if either party has statistics suggesting this calculation is wrong he can move for reconsideration or new trial and we'll be more than ready to entertain that sort of evidence. Since there wasn't any evidence, we're going to make the estimate that it's $16,000.00.

*Id.*

A later opinion by this Court has interpreted this language by reading the *Fa`avae* Court's invitation for further statistics to imply that the Court was "dissatisfied with this conclusion" regarding present discounting. *Clifton v. Voyager, Inc.*, 29 A.S.R.2d 80, 98 (Trial Div. 1995). The invitation supposedly demonstrated the "meager confidence that the court felt in making that ruling." *Id.* The *Clifton* Court then refused to discount for present value, and further closed the door opened by *Fa`avae* to the hearing of further evidence on the issue. It stated that, "where defense counsel has neither asked for reduction nor presented the relevant facts for such a reduction, we will not reduce an award for present value." *Id.*

*Fa`avae*, delivered orally from the bench by Chief Justice Rees, was conversational but not controversial. It espoused a clear judicial policy based on fairness and practical logic, of taking present value and inflation into account whether by judicial notice, considered adjudication, or later submission of evidence. *Clifton* may seem to have contradicted but did not repudiate this practice. That opinion rightly declined to discount where it had not been requested, and refused to give the parties a "second bite at the apple" where they failed to present evidence at trial. *Clifton*, 29 A.S.R.2d at 99.

■ We uphold the precedential practice of *Fa`avae* in rendering the true value of an award. We base this decision on plain economic logic and a sense of fairness. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 538 (1983).

We previously applied a 3% present discount value without comment, where it was presented by plaintiff's accountant. *Tedrick v. Masania'i*, 2

129

A.S.R.3d 120, 130-31 (Trial Div. 1998). Further, the legislature has approved a clear, workable method for determining a true value amount in worker's compensation cases.[7] A.S.C.A. § 32.0666. The statute does not apply to personal injury tort awards; however, that legislative course may, in our view, be fairly applied by analogy in discounting lump-sum future payments in tort awards to present value adjusted for inflation. That is, where a plaintiff is compensated for a future loss, the award may be reduced to its present value by a 3% rate of interest compounded annually, which rate shall be deemed to reflect the true value of dollars, including inflation. Such policy reflects both fairness as well as the pressing need for judicial efficiency.

We direct the parties to recalculate the past loss and future impairment of earnings of Anthony Sardina to account for these findings and conclusions. Calculations are to be made clearly and transparently for the court in table form, such that all steps in the accounting process are apparent. Submissions made without proper transparency will invite suspicion and disfavor.

**IV. Pain and Suffering ·**

We find it appropriate to award noneconomic damages to Sardina for the loss of enjoyment of life, and pain and suffering.

The scale of damage awards in American Samoa ranges from fairly mild injuries for which plaintiffs receive around $10,000 for pain and suffering, to the most serious and painful of injuries which rarely result in awards over $50,000. *Moors v. Am. Samoa Gov't,* 19 A.S.R. 2d 67, 69 (Trial Div. 1991). On the higher end of the spectrum of awards awarded by this Court, we have awarded $80,000 to a man run over by a forklift, who suffered from facial lacerations, contusions, a crushed rib cage, and fractures of the eye socket, femur and pelvis. *Kim v. Star-Kist Samoa, Inc.,* 8 A.S.R.2d 146, 150 (App. Div. 1988) (1986 figure prior to decrease for plaintiff's negligence). In *Kim,* the Appellate Court of American Samoa discussed the fact that general damages awards may be justifiably lower than courts in most American jurisdictions, though higher than in other Pacific jurisdictions. It stated, "[t]he disparity from place to place is accounted for by many factors, including variations in

---

[7] Specifically, discounting for the future value of lump-sum awards is a practice treated by the legislature of American Samoa in A.S.C.A. § 32.0666, which mandates present discounting for workers' compensation lump sum awards. This provision requires that employer liability "be discharged by the payment of a lump sum equal to the present value of future compensation payments commuted, computed at 3% true discount compounded annually."

the amount of goods and services that money can buy and in social attitudes toward pain." *Kim*, 8 A.S.R.2d at 151.

More recently, in *Masania'i*, the Court awarded $100,000 in general damages, including pain and suffering. 2 A.S.R.3d at 130. In deciding on this amount, the Court considered plaintiff's past and present circumstances, including the fact that the plaintiff, previously a gainfully employed police officer, was rendered unable to care for himself. The Court also considered his bleak prognosis, uncertain future, and multiple debilitating injuries. *Id.* In *Gibbons v. American Samoa Government*, 5 A.S.R.3d 49, 70 (Trial Div. 2001), we awarded a rape victim $100,000 for pain and suffering, where plaintiff was rendered entirely dysfunctional, unable to return to her career as a lawyer, do any other kind of work, or have normal relationships with people. For Jones Act and unseaworthiness claims in 1995, we awarded a seaman with incurable carpal tunnel syndrome, who suffered from lack of sleep, pain and numbness, $50,000 for pain and suffering. *Clifton*, 29 A.S.R.2d at 99.

Sardina is unable to return to a career as a fisherman, and suffered post concussion syndrome and back, leg and foot pain as a result of his fall. However, after his December 1999 laser surgery, Sardina is now fit enough to assume any number of occupations, no longer experiences debilitating pain in a daily sense, and appeared at trial to be quite healthy, good-humored and robust. He is fully able to care for himself, work and enjoy leisure. He must, however, practice caution with regards to the disks in his back, which remain vulnerable to collapse. Compared to the other plaintiff victims who have appeared before this court, Sardina appears to be one who has fortunately emerged from his injury well enough to care for himself. Though he may not be able to enjoy extreme sports, Sardina is certainly not precluded from enjoying life. We have also taken into account the extended duration of severe pain and grief endured by Sardina until he was finally relieved by the surgery of December 7, 1999, an operation which the defendants had steadfastly refused to fund him. We award Sardina $45,000 for noneconomic damages.

## V. Comparative Fault

 We have found Kassandra Z to be liable for the unreasonably dangerous floor condition that caused Sardina's injuries. We find, however, that Sardina himself was partially at fault for his fall. Under the Jones Act and the law of unseaworthiness, contributory negligence, however gross, does not bar recovery but only mitigates damages. *Johnson*, 845 F.2d at 1355; *see also Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424, 431 (1939). A trial court's allocation of percentages of

fault is a finding of fact and will not be disturbed unless clearly erroneous. *Johnson*, 845 F.2d at 1355.

A. Primary Duty Rule

Sardina was the licensed officer on board the Kassandra Z. As master, Sardina was the safety officer responsible for correcting unsafe conditions. There is thus some issue as to whether Sardina himself was responsible for the unsafe condition giving rise to his own injury.

 Under the primary duty rule, a "seaman-employee may not recover from his employer for injuries caused by his own failure to perform a duty imposed on him by his employment." *Bernard v. Maersk Lines, Ltd.*, 22 F.3d 903, 905 (9th Cir. 1994) (citing *California Home Brands, Inc., v. Ferreira*, 871 F.2d 630, 836 (9th Cir. 1989)). This rule is based on the employer's independent right to recover against an employee for nonperformance of a duty which resulted in damage to the employer, which right offsets recovery based on the employer's liability to that employee for failure to provide a safe place to work. *Dixon v. United States*, 219 F.2d 10, 16 (2d Cir. 1955). Where the employee consciously assumes a duty toward the wrongdoer as a term of employment, failure of this duty results in a bar to any recovery under the Jones Act. *Clifton*, 29 A.S.R.2d at 91. Application of the primary duty rule is, however, limited by the three principles enunciated in *Bernard*:

> First the "primary duty" rule will not bar a claim of injury arising from the breach of a duty that the plaintiff did not consciously assume as a term of his employment. Second, the rule does not, apply where a seaman is injured by a dangerous condition that he did not create and, in the proper exercise of his employment duties, could not have controlled or eliminated. Third, the rule applies only to a knowing violation of a duty consciously assumed as a term of employment.

22 F.3d at 905. Under these principles, Sardina would be barred from recovery if he (1) consciously assumed a duty to insure the safety of the ship as a term of his employment, (2) is injured by a condition he created and could have controlled and eliminated, and (3) knowingly violated his duties.

We find that Sardina is not subject to the primary duty rule because he did not create the hazardous condition that injured him. The wetness of the floor upon which Sardina slipped was clearly caused by condensation due to the defective freezer door, and not by Sardina.

Further, it has not been proven that Sardina knowingly violated his consciously assumed duty to safeguard the ship. As master of the vessel,

132

Sardina was required to inspect the vessel when he came aboard on December 21, 1995. He did so, and in his testimony and report did not, at that time, notice any problem with the freezer. It also appears that although as master, Sardina was charged to address safety issues where he was notified or made aware of them, the detailed inspections and repairs were rather the primary duty of the chief engineer. Sardina testified that he was not aware of any complaints or accidents of slippage or wetness in the freezer area, and as such, we cannot hold him in violation of his official duties.

## B. Officer at Fault

Though Sardina is not entirely precluded from recovery by the primary duty rule, we find that his deficiencies as a safety officer render him partially at fault for his fall. The Marine Safety Manual states that

> [I]t is the duty of the vessel's officers to see that dangerous conditions are corrected immediately. . . It is of paramount importance that general safety considerations are kept in mind aboard vessels at all times. When hazards are noted, immediate steps shall be taken to keep working conditions as safe as reasonably possible.

(Ex. P.) Sardina claims to have failed to notice the hazards of having a floor half-covered in non-skid strips, perpetually wet because of condensation. Either Sardina's testimony is incredible, or else he acted incompetently as an officer of the ship. Sardina lived and worked on the vessel for one month and traversed the passageway at least three times per day. The wet terrazzo freezer area obviously contrasted with the long run of black safety strips preceding it. Six individuals had fallen in the same location previously. In diligent, proper exercise of his duties, Sardina should have noticed, and could have controlled the slipperiness *through such inexpensive, makeshift, and easy fixes such as*, for example, placing plywood over the area as has been done since the accident. Sardina's sheer insensitivity to hazardous conditions is excused from sanction by the primary duty rule. We find, however, that Sardina's failure to notice much less investigate and repair the slippery floor constitutes a partial failure of the official duty of an officer to insure the safety of the ship, and that this failure contributed to his mishap.

## C. The Missing Flip-Flop

We further find Sardina at fault because he was wearing what he calls "shower shoes," commonly known as "flip-flops," when he fell. We are sufficiently convinced by experience and evidence that Sardina's choice to sport flip-flops, which have nothing in the way of laces or braces to

maintain stable support in wet conditions or on slippery surfaces renders him partially at fault for his fall.

Captain Medina testified that flip-flops are troublesome in a maritime environment, where floors are constantly wet and likely to be slippery. He also testified that he did not allow them on any of the vessels he oversaw in his 20 years' of experience as fish captain. This Court accepts Captain Medina's testimony as to the inappropriateness of flip-flops in the generally wet environment of a fishing vessel.

The High Court holds jurisdiction over a lone United States territory in the Neotropical South Pacific. The flip-flop has long been a staple of modern Samoan living. It rains here often. It squalls and it storms. Puddles are bountiful. Flip-flops provide no lateral support, no heel or catch, no velcro, nor laces to anchor the ankle in wet conditions. Extreme caution is engendered in all, from young to old, who choose to wear flip-flops rather than walk barefoot in our world of water.

Sardina chose to wear flip-flops. This exacerbates his fault because of his ill-considered choice of footwear, and because as safety officer, he set an example for the ship's crew. It has been shown that, when not working, Sardina's men wore lace-up deck shoes to minimize the probability of accidents such as this one. Sardina chose a more dangerous shoe, slipped in precarious conditions, and must bear some blame for the consequence of that choice. Put in legal terms, we find that Sardina's oversights as safety officer and his choice to wear unsafe footwear also contributed to his injuries.

We review the primary duty rule, Sardina's status as master, and his choice of footwear and assess him 40% of the blame for the fall.

## VI. Maintenance and Cure

Sardina also brings a suit to enforce liability under maintenance and cure, an ancient doctrine of maritime law arising from an implied provision in the contract of marine employment, whereby a shipowner pays for any injury or illness which manifests during employment, regardless of the source of the injury or whether it preexisted the journey, so long as there was no willful misbehavior on the part of the seaman. *Clifton*, 29 A.S.R.2d at 100; *Vella v. Ford Motor Co.*, 421 U.S. 1, 4 (1975); *Laruitzen v. Larsen*, 345 U.S. 571, 574 n.3 (1953). The purpose of the maintenance and cure obligation is to protect the health and safety of seamen, and to encourage them to enter such employment. *Vella*, 421 U.S. at 4.

The right of a seaman to recover under the Jones Act, and his

right to maintenance and cure under admiralty law, are independent and cumulative. *Garrett v. Moore-McCoramack Co.*, 317 U.S. 239, 240 n.2 (1942); *Koehler v. United States*, 187 F.2d 933, 937 (7th Cir. 1951); *McKinley v. Carnegie-Illinois Steel Corp.*, 69 F. Supp. 893, 894 (W.D. Pa. 1947). Where negligence is found against an employer by a plaintiff seaman under the Jones Act, it supplements but does not supplant further remedies for maintenance and cure. *Mahramas v. Am. Export Isbrandtsen Lines, Inc.*, 475 F.2d 165, 169 (2d Cir. 1973). In contrast to remedies given by the Jones Act, the liability of a shipowner for maintenance and cure of a sick or injured seaman exists irrespective of fault or negligence on the part of the shipowner or his agents. *Mudspeth v. Atl. & Gulf Stevedores, Inc.*, 266 F. Supp. 937, 944 (D. La. 1967).

 Maintenance and cure obligations arise when a seaman becomes disabled through no fault of his own while in service of the ship. *Gooden v. Sinclair Ref. Co.*, 378 F.2d 576, 579 (3d Cir. 1967). The only requirement for eligibility is that the seaman be "in the service of his ship" at the time of the injury. *Clifton*, 29 A.S.R.2d at 100. Sardina was indisputably in the service of Kassandra Z when he slipped, fell, and received injuries to his back and head. He is thus entitled to maintenance and cure benefits.

A. Maintenance

 Maintenance, while being cured, takes the place of the seaman's sustenance on the ship. It has been defined as "compensation for room and board expenses incurred while the seaman is recovering from illness or injury." *Berg v. Fourth Shipmor Ass'n*, 82 F.3d 307, 309 (9th Cir. 1996). Some evidentiary proof must be offered regarding the seaman's actual expenditures or actual liability incurred for maintenance and cure. NORRIS, MARTIN J., THE LAW OF SEAMEN § 26:35 (4th ed. 1985).

No evidence or testimony has been submitted regarding actual or constructive living costs incurred while Sardina was under treatment. Sardina merely informs us that TCW Credits paid maintenance at $20.00 per day through December 4, 1996, and argues that he is entitled to the same *per diem*. Sardina also testifies that he lived with his parents, free of rent and food costs.

We quote the Fifth Circuit, which stated:

> Our exhaustive research of the case law in this circuit has revealed no case which has awarded a "going rate" of maintenance to a plaintiff who has failed to submit evidence of his costs. A seaman's burden of production in establishing the value of his maintenance is feather light: his own testimony as

to reasonable cost of, room and board in the community where he is living is sufficient to support an award. Because the evidence before the court often consists solely of the seaman's testimony, it is common for courts to award a standard *per diem*. Standardized rates of maintenance, however, do not dispense with the requirement that a plaintiff-seaman provide the trier of fact with an evidentiary basis upon which to determine a justifiable amount.

*Yelverton v. Mobile Lab., Inc.*, 782 F.2d 555, 558 (5th Cir. 1986); *see also Springborn v. Am. Commercial Barge Lines, Inc.*, 747 F.2d 89, 94 (5th Cir. 1985). Sardina did not testify as to his actual living expenses. Without a factual basis, we are precluded from granting an award of maintenance.

The only testimony offered by Sardina regarding his living situation was that he lived rent-free with his parents for some time while recuperating from his injury. While living with parents and not incurring actual expenses or liability for care and support, some courts have held that a seaman is not entitled to a decree of maintenance based on the fact that he incurs no actual expense or liability for his care and support. NORRIS, MARTIN J., THE LAW OF SEAMEN § 26:36. Thus, we find the record insufficient to award maintenance benefits to Sardina based on his failure to submit evidence as to his actual expenses, as well as the fact that he lived with his parents without liability during his recovery.

B. Cure

■ The vessel owner is also obliged to pay medical expenses of the seaman until he reaches maximum recovery or until the disease or illness is recognized as "incurable." *Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962); *Vella*, 421 U.S. at 5; *Farrell v. United States*, 336 U.S. 511, 515 (1949).

■ Expenses of the cure are those actually incurred by the seaman, and his recovery is limited to the amount actually expended or liability actually incurred. NORRIS, MARTIN J., THE LAW OF SEAMEN § 26:36. Medical bills for treatment of Sardina's head and back injuries until March 8, 2000 have been submitted amounting to $34,221.27, including all bills related to Sardina's laser surgery and $1,200 for surgery to the L3-4 disks that TCW Credits claims was not the result of the fall. Only the $1,200 for surgery to the L3-4 disks is contested. We are not convinced that the damage to the L3-4 disks is separable from Sardina's other back damage, given the controverting testimonies, and find Sardina deserving of medical bills totaling $34,221.27.

TCW Credits has already made a partial payment toward Sardina's medical bills of $15,801.21. Sardina is thus owed a remaining balance of $18,420.06.

*1. Future Fusion Surgery*

■ There is a further issue of whether Sardina has yet reached the point of maximum cure at which defendant's obligation to pay maintenance and cure ends. *Farrell*, 336 U.S at 515. Maximum cure is achieved when it is probable that further treatment will result in no betterment of the seaman's condition. *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 530 (1938).

Dr. Richley has stated that though Sardina was discharged by Dr. Laufenberg on March 8, 2000, Sardina still has an 85% chance of future fusion surgery, costing about $30,000, since the L5 disk is right above the pelvis and at risk of stress. Dr. Vance, however, estimated that less than half of those receiving back surgery require two operations, which statistic decreases significantly over time. Based on the fact that Sardina showed no deterioration a year past surgery, we accept Dr. Vance's opinion that future fusion surgery is not needed for Sardina.

We find, as a matter of fact, that Sardina reached a point of maximum cure on March 8, 2000, the date at which Dr. Laufenberg deemed Sardina fully recovered and discharged him. The fact of Sardina's recovery is further underscored by Dr. Richley's having released him from care shortly thereafter, on April 10, 2000, after finding there to be no nerve damage or leg pain which might indicate need for observation for imminent·collapse or further medical intervention. We have been presented with no objective medical evidence or report as to the need for fusion surgery for improvement of Sardina's physical condition. Dr. Richley and Dr. Laufenberg both declared him fit and as far as possible, free of pain. Any future surgery at this point is simply speculative. Where it appears that further treatment will merely relieve pain and suffering and not otherwise improve physical condition, it is proper to declare the point of maximum cure. *See, e.g., Simmons v. Hope Contractors, Inc.*, 517 So. 2d 333, 339 (La. Ct. App. 1987). Where such future treatments are entirely speculative, seamen are not entitled to payments for cure. *Flower v. Nordsee, Inc.*, 657 F. Supp. 235, 236 (D. Me. 1987).

We thus find that Sardina reached maximum recovery on March 8, 2000. Any future need for medical treatment appears, based on all evidence presented, too speculative to merit payment for cure,

## C. Attorney's Fees

Sardina claims that he is entitled to an award of attorney's fees based on the allegation that Kassandra Z has willfully failed to pay maintenance and cure.

 The shipowner's failure to meet the maintenance and cure obligation may result in liability for consequential and incidental damages, including the "necessary expense" of attorney's fees, where employers are "willful and persistent" in their "recalcitrant" refusal to pay maintenance and cure, where they are "callous in their attitude, making no investigation of libelant's claim and by their silence neither admitting nor denying it." *Vaughan,* 369 U.S. at 530; *see also Glynn v. Roy Al Boat Mgmt. Corp.,* 57 F.3d 1495, 1501 (9th Cir. 1995); *Morales v. Garijak, Inc.,* 829 F.2d 1355, 1358 (5th Cir. 1987); *Hines v. J.A. Laporte, Inc.,* 820 F.2d 1187, 1190 (11th Cir. 1987). The Fifth Circuit has identified examples of willfulness meriting punitive damages and counsel fees, including:

(1) laxness in investigating a claim;
(2) termination of benefits in response to the seaman's retention of counsel or refusal of a settlement offer; [and]
(3) failure to reinstate benefits after diagnosis of our ailment previously not determined medically.

*Hines,* 820 F.2d at 1190 (citing *Tullos v. Resource Drilling, Inc.,* 750 F.2d 380, 388 (5th Cir. 1985)).

We find that the shipowners of the Kassandra Z were willful and persistent in their failure to recognize, investigate or pay for Sardina's cure. Kassandra Z clearly failed to pay Sardina despite having received notice of Sardina's accident, up-to-date medical reports and expense amounts, and recommendations to remit payments for cure, all from Arnold and Arnold. The vessel owners also seem to have received letters from Sardina's attorney as early as August 1996, regarding Sardina's need for maintenance and cure payments. Especially determinative in this regard are Sardina's numerous unheeded applications for payment of medical bills, especially for the necessary, curative back surgery that did not occur until four years post-accident. Such callous lack of investigation and silence in response to injuries incurred by a seaman in that ship's employ is precisely what the U.S. Supreme Court in *Vaughan* found to render plaintiff-seaman's attorney's compensatory fees. Financial difficulties on the part of Kassandra Z do not excuse its failure to respond to, much less attempt to address, Sardina's right to maintenance and cure without having to resort to the laborious, complicated, and resource-draining process of law.

We thus award attorney's fees on the amount of 50% of Sardina's award for maintenance and cure.

## Order

1. For Kassandra Z's unseaworthiness and negligence, we award to Sardina lost earnings prior to trial, lost future earnings for impairment of earning capacity diminishable by probable future earnings in aviation, and $45,000 for pain and suffering. This award is to be recalculated according to the following findings of fact:

 a. Sardina is physically unable to return to a career in fishing;

 b. Sardina would not have been a captain;

 c. His base salary would have been an average of $61,159 per year;

 d. Pre-trial lost earnings should be adjusted to account for $4,000 in FICA benefits;

 e. Social security taxes are not to be subtracted from Sardina's expected earnings in aviation;

 f. Sardina's work life expectancy is 47;

 g. Sardina's life expectancy is 73.6;

 h. Sardina's probable future earnings are an average of $48,000 per year;

 i. The lump sum of future compensation payments to Sardina is to be discounted to present value and adjusted for inflation, at 3% true discount compounded annually.

 j. Sardina is to receive 60% of the resultant sum.

2. We award to Sardina $18,420.06 for maintenance and cure.

3. Due to Kassandra Z's willful failure to meet maintenance and cure obligations, we award Sardina 50% of the maintenance and cure award, or $9,210.03, in attorney's fees. The recalculations due from the parties shall be filed within 20 days of date hereof.

It is so ordered.